NATIONAL UNION FIRE INSURANCE CO. (C5–94–1767), Minnesota Joint Underwriting Association (C7–94–1768), Respondents,

v.

Gerald W. GATES, et al., Defendants,

Noel Travell Martin, et al., Appellants.

Nos. C5–94–1767, C7–94–1768.

Court of Appeals of Minnesota.

April 25, 1995.

Review Denied June 23, 1995.

William M. Hart, Michael D. Hutchens, Meagher & Geer, P.L.L.P., Minneapolis, for respondent Nat. Union Fire Ins. Co.

Mary Steenson, Bassford, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for respondent Minn. Joint Underwriting Ass'n.

Elizabeth A. Cloutier, Cortlen G. Cloutier, Cloutier & Cloutier, P.A., Minneapolis, and Philip F. Fishman, Minneapolis, for appellants Noel Travell Martin, et al.

Considered and decided by LANSING, P.J., KALITOWSKI and MULALLY,* JJ.

## OPINION

EDWARD D. MULALLY, Judge.

Noel Martin's and Gerald Martin's actions against their former foster caregiver, Gerald Gates, resulted in judgments for each of

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

$1,000,000. National Union Fire Insurance Company (NUFIC) and the Minnesota Joint Underwriting Association (MJUA), the foster parent liability insurance providers for the State of Minnesota for the period of the abuse, brought declaratory judgment actions against the Martins, claiming they owed no duty to defend or indemnify defendants Gerald Gates and Kenneth Robinson. These actions were consolidated. NUFIC and MJUA brought a joint motion for summary judgment, which was granted by the trial court. The Martins' separate appeals of this grant of summary judgment have been consolidated.

## FACTS

Gates became a licensed foster parent in May 1978 and Hennepin County revoked his license in December 1989. The county never gave a foster parent license to Robinson, Gates' live-in companion. Gates received his license only after recanting his statement in his first license application that corporal punishment was appropriate and that he and Robinson would not refrain from it.

Defendants Noel Martin and Gerald Martin were left by their mother in the care of Gerald Gates in 1977. After Gates became a licensed foster caregiver, the Martins continued to live with him until July 1989. During this period, Gates and Robinson sexually and physically abused the children.

The sexual abuse of Noel Martin, the older brother, occurred about three or four times a week and the physical abuse about two or three times per week. The sexual abuse was often followed by physical abuse. This pattern lasted approximately four years, until the frequency of the abuse decreased. Gates threatened to kill Noel if he should ever tell anyone about the abuse and prevented Noel from spending time with his biological family. The physical abuse ended in 1986 or 1987. The sexual abuse ended about 1984, but Gates continued to attempt to force himself upon Noel and to invade Noel's privacy until 1989.

Gates abused Gerald Martin three to five times per week but the frequency decreased as Gerald grew older and more capable of fighting back. The physical and sexual abuse of Gerald Martin ended, at the latest, in 1989. Gates told Gerald that the police would come and get him if he ever revealed to anyone the details of the abuse.

### Insurance Policies at Issue

NUFIC and MJUA provided the state's foster parent liability coverage during the period that the Martins were abused. The insurance companies issued six consecutive foster parent liability policies to provide coverage for state-designated licensed foster parents; NUFIC issued the policies in effect from January 11, 1978 until January 11, 1984, and MJUA issued the policies in effect thereafter. From January 11, 1978 to January 11, 1981, the policies were "claims-made" policies. From January 11, 1981 to January 11, 1984, the policies were "occurrence" policies. The MJUA policy is of the claims-made variety.

### NUFIC Policies

The NUFIC claims-made policies covered bodily and personal injury suffered by a foster child while in the care and custody of a foster parent. The policies contained an exclusion for "personal injury arising out of the willful violation of a penal statute or ordinance by or with the knowledge or consent of any Insured." The policy defined "personal injury" as "injury to the feelings or reputation of any person or organizations arising out of libel, slander, defamation of character, wrongful eviction or entry, and alienation of the affections of a foster child from his natural parents or legal guardian."

The NUFIC occurrence policies contained several exclusions at issue in this case. In addition to the aforementioned exclusion, the occurrence policies "[did] not apply * * * to any dishonest, fraudulent, criminal, or malicious act, error or omission of an Insured." Likewise, the policies did not apply "to licentious, immoral or sexual behavior intended to lead to or culminating in any sexual act."

### MJUA Policy

MJUA, created by Minn.Stat. § 621.02 (1986), has provided foster parent liability insurance to the state from January 11, 1986 to the present. MJUA's coverage is of the claims-made variety, and contains exclusions

almost identical to those of the NUFIC policies. The relevant exclusions include

(b) any loss arising out of a dishonest, fraudulent, criminal or malicious act;

\* \* \* \* \* \*

(h) personal injury:

(1) arising out of the willful violation of a penal statute or ordinance by or with the knowledge or consent of any insured;

\* \* \* \* \* \*

(k) bodily injury arising out of or resulting from the actual, alleged or threatened sexual molestation of a minor by:

(1) any insured;

\* \* \* \* \* \*

MJUA shall have no duty to defend any claim or suit involving sexual molestation of a minor, regardless of the circumstances involved in the claim or suit, even though the allegations may be groundless, false or fraudulent.

### Litigation

The Martins brought suit against Gates and other defendants for injuries resulting from physical and sexual abuse and negligence. The Martins ultimately settled their claims against Robinson and Hennepin County and received a default judgment of $1,000,000 each against Gates for sexual and physical abuse and for negligence. The judgment amount was equally divided among four bases: negligent infliction of emotional distress; negligence/negligent parenting/breach of duty to supervise and protect; sexual assault and battery; and physical assault and battery. Neither NUFIC nor MJUA appeared to defend Gates, who had admitted to sexually and physically abusing the Martins. Gates ultimately was discharged from the case and from financial liability after declaring bankruptcy.

NUFIC and MJUA brought declaratory judgment actions against the Martins, claiming they owed no duty to defend or indemnify defendants Gerald Gates and Kenneth Robinson. After consolidation, NUFIC and MJUA brought a joint motion for summary judgment which was granted by the trial court. This court also consolidated the Martins' separate appeals of this grant of summary judgment. The Martins claim that National Union and MJUA have a duty to indemnify Gerald Gates for damages caused by his negligent and intentional acts.

### ISSUES

Did the district court err in determining that exclusions in the policies of the Minnesota Joint Underwriting Association and National Union Fire Insurance Company preclude coverage for the injuries suffered by Noel Martin and Gerald Martin?

a. With respect to the NUFIC policy, did the insurer's failure to provide notice of a substantial reduction in coverage render the terms of the occurrence policies issued by NUFIC inapplicable here? Do the terms of the previously issued policy cover the injuries suffered by the Martins?

b. Does Minn.Stat. § 245.814 (1992) reflect a legislative intent that the state procure insurance in excess of standard homeowners' policies, including insurance to cover the injuries at issue in this case? Even if the insurance policies at issue did not conform to this intent, are the Martins' injuries covered?

c. Are the Martins' allegations of negligence covered by the NUFIC and MJUA policies?

### ANALYSIS

#### *Standard of review*

■ On appeal from summary judgment, this court must determine whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979)). "The nonmoving party has the benefit of that view of the evidence which is most favorable to him and is entitled to have all doubts and factual inferences resolved against the moving party." *Progressive Cas. Ins. Co. v. Kraayenbrink*, 370 N.W.2d 455, 459 (Minn. App.1985), *pet. for rev. denied* (Minn. Sept. 19, 1985).

### Duty to Defend

██ An insurer determines its obligation to defend by comparing the complaint's allegations and the relevant policy language. *Garvis v. Employers Mut. Cas.*, 497 N.W.2d 254, 256 (Minn.1993). If the pleadings do not raise a claim "arguably" within the scope of coverage, the insurer has "no duty to defend or investigate further." *Id.* at 258. An insurer seeking to escape its duty to defend must establish that all parts of the cause of action fall clearly outside the scope of coverage. *Rulli v. State Farm Fire & Cas.*, 479 N.W.2d 87, 88 (Minn.App.1992). The question in this case is whether injuries suffered as a result of acts alleged to have been committed by Gates are covered under the terms of the insurance policies at issue.

### 1. Coverage

We conclude that the Martins' injuries are not covered under the policies at issue in this case.

The provisions of an insurance policy are to be interpreted according to plain, ordinary sense so as to effectuate the intention of the parties. The policy should be construed as a whole with all doubts concerning the meaning of language employed to be resolved in favor of the insured. The terms of an insurance policy should be construed according to what a reasonable person in the position of the insured would have understood the words to mean rather than what the insurer intended the language to mean.

*Canadian Universal Ins. v. Fire Watch*, 258 N.W.2d 570, 572 (Minn.1977).

The three claims-made policies, in effect from January 11, 1978 until January 11, 1981, cannot be invoked because no claims were made while the policies were in effect. The coverage thereafter changed to occurrence policies that remained in effect through January 11, 1984. All of the policies contain exclusions for malicious acts and sexual molestation.

#### a. Notice

██ The Martins claim that the exclusions in the NUFIC occurrence policies are void

because NUFIC, in changing from a claims-made to occurrence policy, did not provide the required notice to the insured that coverage was being reduced substantially by exclusion of criminal and sexual acts. They argue that absent the requisite notice, the occurrence policy had no effect and, therefore, the claims-made policy remained in effect.

As support, the Martins cite *Canadian Universal*, where the supreme court held that when a policy renewal or endorsement substantially reduces prior insurance coverage, the insurer has an affirmative duty to notify the insured in writing of the change in coverage. 258 N.W.2d at 575. Otherwise, the supreme court noted, the reduction in coverage is void and questions of coverage will be determined in accordance with the terms of the original policy. *Id.*

In this case, the record reflects that the Department of Public Welfare received a letter at the time the NUFIC coverage was changed describing the changes which *expanded* coverage. The record further reveals that NUFIC agents believed that the explicit mention of the criminal and sexual exclusions in the occurrence policies, as opposed to the prior claims-made policies, was not a significant policy change, because "[t]he policy never was intended to cover any type of abuse, sexual, physical, emotional abuse" and "it was always the intent of the policy to exclude abuse". There is no evidence in the record that the insureds' understanding of the coverage departed in any way from that of the insurer's. Even when we resolve all doubts concerning the meaning of the language employed in the policy in favor of the insured, we conclude that the notice concerns discussed in *Canadian Universal* are not invoked in this case.

██ Even if we were to agree with the Martins that NUFIC failed to provide adequate notice of a substantial reduction of coverage in this case, the appellants would nonetheless be unsuccessful. Although NUFIC's earlier claims-made policy did not contain explicit exclusions for acts of sexual and physical abuse, such acts, nonetheless, are not covered as a matter of public policy. *See D.W.H. v. Steele*, 512 N.W.2d 586, 589

(Minn.1994) (holding that public policy favors the exclusion of intentional acts as contained in the MJUA policy).

### b. Minn.Stat. § 245.814

The Martins also argue that Minn. Stat. § 245.814 (1992), supports their claim for injuries suffered while in foster care. We disagree.

In 1977, in response to a need for more foster care providers, the Minnesota legislature enacted Minn.Stat. § 245.814 (Supp. 1977). *See D.W.H.*, 512 N.W.2d at 588 ("This coverage is extended as a benefit to foster home providers to encourage care of persons who need out-of-home care.") (quoting Minn.Stat. § 245.814, subd. 3 (1986)). Under the statute, insurance shall be provided "to the extent that the liability is not covered by the provisions of the standard homeowner's or automobile insurance policy." Minn.Stat. § 245.814, subd. 2 (1992). The statute mandates that "[t]he state shall provide compensation for bodily injury * * * resulting from the foster home providers [sic] activities as a foster home provider while the foster child or adult is in the care, custody, and control of the foster home provider in an amount not to exceed $250,000 for each occurrence." Minn. Stat. § 245.814, subd. 3 (1992). The Martins claim that this statute renders the exclusions in the respondents' policies invalid.

The supreme court has already confronted the seemingly conflicting language the Martins raise in *D.W.H. v. Steele*, 512 N.W.2d 586 (Minn.1994). In *D.W.H.*, plaintiff foster child, who was sexually abused by another foster child while the two were in a foster home, sued the latter child for intentional sexual abuse. *Id.* at 587–88. The plaintiff also sued the foster home provider for negligent supervision and for intentional sexual and physical abuse. *Id.* at 587. The supreme court rejected plaintiff's claim that the insurer under a foster care liability policy was required to defend with respect to the resident who had harmed D.W.H. *Id.* at 589. The supreme court held that section 245.814 does not cover potential liability of foster care *residents*. *Id.* at 588. The supreme court reasoned that "the legislature assumed that the statutorily directed policy would

mirror standard policy language," because Minn.Stat. § 621.06 (the statute creating MJUA) favors the exclusion of intentional and criminal acts in insurance policies. *D.W.H.*, 512 N.W.2d at 589.

The Martins seek to distinguish *D.W.H.* on the basis that section 621.06 was enacted *after* NUFIC had ceased providing foster care provider liability insurance to the state. They claim that because there would have been no conflict between statutes for the period 1978–1984, and because the NUFIC claims-made policies did not contain any exclusions for sexual abuse and intentional acts, the statute would have required the state to provide excess coverage during that time. We disagree based upon the public policy against indemnifying intentional and criminal acts. *See D.W.H.*, 512 N.W.2d at 589; *see also State Farm Fire & Cas. v. Williams*, 355 N.W.2d 421, 424 (Minn.1984) (finding that insurance policy excluding intentional acts did not cover nonconsensual sexual acts); *Fireman's Fund Ins. v. Hill*, 314 N.W.2d 834, 835 (Minn.1982) (noting that "intention to inflict injury can be inferred as a matter of law"). Although the NUFIC claims-made policy contained no such exclusion, we reiterate that the record below shows that it was always the intent of the policy to exclude claims of abuse. We also note that given public policy on this issue, the State of Minnesota could not have reasonably expected that claims such as these would be covered. *See Atwater Creamery v. Western Nat'l Mut. Ins.*, 366 N.W.2d 271, 278 (Minn. 1985) (accepting the reasonable-expectations doctrine as Minnesota law).

The Martins raise legislative history in an attempt to demonstrate that it was the intention of the legislature to cover claims of this type. We disagree. This history reveals the legislature was concerned with obtaining insurance coverage for foster caregivers, not with covering intentional and criminal acts. *See* 1986 Minn.Laws ch. 313, § 10 (adding language indicating that purpose of act was to encourage persons to become foster parents). The legislature would not encourage foster care by condoning illegal acts.

## Claims of Negligence

The Martins argue that their claims of negligence are covered by the policies at issue in this matter. The trial court in the underlying action awarded each of the Martins $250,000 on each of two negligence counts. Its conclusion was that Gates employed excessive corporal punishment and stood aside when he knew or should have known that Robinson was employing excessive corporal punishment against the boys. The district court, in granting summary judgment to NUFIC and MJUA, concluded that

> the claims of negligence and infliction of emotional distress derived from the sexual and physical abuse. Without the sexual and physical contact—precluded from coverage by the exclusions—there would be no claim for negligence or infliction of emotional distress

The supreme court disposed of a similar claim in *Allstate Ins. v. S.F.*, 518 N.W.2d 37 (Minn.1994). In that case, an insured brought two friends with him to the house of a woman friend. *Id.* at 38. The insured claimed the three men had consensual sexual relations with the woman. *Id.* at 39. The insured then left and the two friends thereafter sexually assaulted the woman. *Id.* The woman's negligence claim was that the insured had abandoned her in a zone of danger of physical impact. *Id.* at 40. The supreme court held that "this allegation is just a variation of the intentional assault claims." *Id.*

> The difficulty with this theory * * * is that it attempts to isolate one aspect of the insured's conduct from his whole conduct that evening and then label it negligence. In fact, however, if complainant's version of events is true, the sexual assaults that evening were part of an overall intentional plan on the part of the three men to use plaintiff for their sexual pleasure. This is reprehensible conduct, but it is intentional reprehensible conduct for which all three defendants are liable to plaintiff for intentional assault and battery.

*Id.* at 41.

The supreme court went on to explain that even if a special relationship existed which would impose a duty upon the insured to protect the woman, "[u]nder the circumstances of this case, the alleged failure of the three men to protect the plaintiff from each other was simply part of an alleged deliberate and intentional conspiracy to take advantage of plaintiff sexually." *Id.* In this matter, absent the sexual and physical abuse, there would be no claim for negligence or infliction of emotional distress. Because coverage for the sexual and physical abuse is precluded, the claim for negligence or infliction of emotional distress is similarly precluded.

### DECISION

The trial court properly granted summary judgment, holding that coverage is not available for the claimed injuries.

**Affirmed.**