**REDEEMER COVENANT CHURCH OF BROOKLYN PARK, Respondent,**

v.

**CHURCH MUTUAL INSURANCE COMPANY, intervenor-plaintiff, Respondent,**

**Lutheran Benevolent Insurance Company, intervenor-plaintiff, Respondent,**

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, intervenor-plaintiff, Respondent,**

v.

**ATLANTIC MUTUAL INSURANCE COMPANY, Appellant,**

**A.J., et al., Respondents,**

**C.S.B., et al., Defendants,**

and

**Albert C. Magnuson, intervenor-defendant, Respondent.**

No. C5–96–2616.

Court of Appeals of Minnesota.

July 29, 1997.

Review Denied Oct. 1, 1997.

Richard P. Mahoney, Victor E. Lund, Mahoney, Dougherty and Mahoney, P.A., Minneapolis, for Appellant.

Paul R. Smith, Abrams & Smith, P.A., Minneapolis, for Respondent Lutheran Benevolent Ins. Co.

Theodore J. Collins, Thomas E. McEllistrem, Collins, Buckley, Sauntry & Haugh, P.L.L.P, St. Paul, for Respondent Church Mutual Insurance Co.

David D. Alsop, Anne T. Johnson, Gislason, Dosland, Hunter & Malecki, P.L.L.P., Minnetonka, for Respondent St. Paul Fire & Marine Ins. Co.

Jeffrey R. Anderson, Mark A. Wendorf, Reinhardt and Anderson, St. Paul, for Respondent Claimants.

Laurie J. Miller, Richard D. Snyder, Fredrikson & Byron, P.A., Minneapolis, Richard L. Pemberton, Jr., Minneapolis, for Respondent Redeemer Covenant Church of Brooklyn Park.

Kenneth F. Daniels, Minneapolis, for Respondent Magnuson.

Considered and decided by CRIPPEN, P.J., and HUSPENI and WILLIS, JJ.

## OPINION

HUSPENI, Judge.

Respondent, an insured, tendered claims to its four insurers, appellant and three other insurers. The three other insurers admitted liability and agreed to defend; appellant denied liability and refused to defend. Respondent brought a declaratory judgment action to determine appellant's obligation to indemnify or defend, and the three other insurers intervened. All parties moved for summary judgment.

Following a hearing, the district court issued a memorandum order holding in relevant part that: (1) appellant was obligated to defend and indemnify its insured pursuant to its pastoral professional liability policy because the exclusions in the policies did not apply to this insured and because the claims made during one policy period did not prevent the insured from obtaining claims-made coverage during a subsequent policy period; (2) appellant's pastoral professional liability coverage was primary and the insured's comprehensive general liability policies were secondary; (3) appellant's umbrella policy that did not restrict coverage to occurrences during the policy period provided excess coverage for occurrences outside the policy period; (4) appellant was obligated to defend, but not to indemnify, under its comprehensive general liability policies; (5) the loan receipt agreements that two defending insurers had with the insured entitled those insurers to contribution of part of the defense costs from appellant; and (6) appellant was required to pay the insured's attorney fees incurred in bringing the declaratory judgment action.

Appellant's first appeal was dismissed as premature, and the case was remanded for a computation of money damages. Appellant filed a notice of appeal from the remanded judgment; the three other insurers and the insured filed notices of review. We affirm.

## FACTS

During the 1960s, 1970s and 1980s, Reverend Albert Magnuson, pastor of respondent Redeemer Covenant Church of Brooklyn Park, sexually abused and molested fifteen respondent-claimants.[1] Seven brought actions against Redeemer in 1989; eight brought actions in 1991. All alleged that Redeemer had been negligent in retaining and supervising Magnuson.

Redeemer was insured at various times by appellant Atlantic Mutual Insurance Company and respondents Saint Paul Fire and Marine Insurance Company (SPI), Lutheran Benevolent Insurance Company (LBI), and Church Mutual Insurance Company (CMI). All incidents of abuse occurred while Redeemer had occurrence-based comprehensive general liability (CGL) coverage from CMI, LBI, and SPI; all the claims were brought while Redeemer had claims-made pastoral professional liability (PPL) coverage, occurrence-based CGL coverage, and umbrella coverage from Atlantic.[2]

CMI: occurrence-based CGL coverage from 1965 through June 1976 and from July 1985 though June 1988, and umbrella coverage from July 1985 through June 1988.
LBI: occurrence-based CGL coverage from July 1982 to July 1985.
SPI: occurrence-based CGL coverage policies from July 1976 through June 1982 and umbrella coverage from July 1980 through June 1982.

---

1. There were actually 17 claimants, but the parties agree that the claims of two are irrelevant to this appeal.

2. Specifically, coverage provided by the various insurers was:
   Atlantic: occurrence-based comprehensive general liability (CGL) coverage, claims made pastoral professional liability (PPL) coverage, and umbrella liability coverage from July 1988 through December 1992.

## ISSUES [3]

1. Does an insurer waive its right to invoke policy exclusions by failing to respond to a notice of claims within the statutory period? [4]

2. Does an exclusion narrowly drafted to apply to particular acts or behavior preclude coverage for an insured who has not committed the excluded acts or behavior?

3. Does an insured's knowledge that abuse has occurred and that claims were brought more than a year earlier constitute knowledge of circumstances that might lead to a claim, thus precluding subsequent coverage under a claims-made policy?

4. Does a pastoral professional liability policy have priority over a comprehensive general liability policy in providing coverage for liability incurred as a result of the performance of a pastor's professional duties?

5. Does an umbrella policy that does not restrict coverage to occurrences during the policy period provide excess coverage for net liability incurred from covered activities during the policy period?

6. Is there a duty to indemnify for damages resulting from abuse under an occurrence based policy when no abuse occurred during the policy period?

7. Does a defending insurer's loan receipt agreement with an insured entitle the insurer to recover defense costs from a non-defending insurer?

8. Is it an abuse of discretion to require a non-defending insurer to pay an insured's attorney fees incurred in an action establishing the insurer's duty to defend?

**3.** At oral argument, respondent insurers withdrew their challenge to the district court's holding on aggregate limits; therefore, we do not address that issue.

**4.** The district court did not address this issue; its determination that the exclusions did not apply rendered the issue moot. However, because waiver could potentially dispose of a major issue, this court arguably may review it. *See Harms v. Independent Sch. Dist. No. 300*, 450 N.W.2d 571, 577 (Minn.1990) ("An appellate court may de-

## ANALYSIS

### Standard of Review

The parties agree that there is no dispute as to any material facts and that summary judgment is appropriate. Where the material facts are not in dispute, a reviewing court need not defer to the trial court's application of the law. *Hubred v. Control Data Corp.*, 442 N.W.2d 308, 310 (Minn.1989). "[T]he interpretation of insurance contract language is a question of law as applied to the facts presented." *Meister v. Western Nat'l Mut. Ins. Co.*, 479 N.W.2d 372, 376 (Minn.1992).

### 1. Is Atlantic estopped from invoking the exclusions?

Atlantic argues that the exclusions in its PPL policies apply to Redeemer. As a threshold matter, we address Redeemer's contention that Atlantic is estopped from invoking these exclusions.[5]

Minn.Stat. § 72A.201, subd. 4(11) (1996), provides that it is an unfair settlement practice for an insurer to

> fail * * *, within 60 business days after receipt of a properly executed proof of loss, to advise the insured of the acceptance or denial of the claim by the insurer.

The statute specifies no consequence for those who violate its provisions and engage in unfair practices. Atlantic violated this provision: it received notice of the actions against Redeemer in 1989 and 1991 and did not respond until February 1993, when it filed an answer asserting the exclusions as defenses.

Redeemer argues that Atlantic's delay in responding to the tender of defense estopped Atlantic from invoking its exclusions. To

cide an issue not determined by a trial court where that question is decisive of the entire controversy * * *.").

**5.** SPI, CMI, and LBI also raise this argument. However, estoppel cannot be asserted by third parties who have no rights under an insurance contract: "[e]stoppel can only affect rights reserved in the policy." *Malakowsky v. Johannsen*, 374 N.W.2d 816, 818 (Minn.App.1985). Only Redeemer, as the insured, has standing to assert estoppel against Atlantic.

support this argument, Redeemer relies on a footnote in *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 316 (Minn.1995), which reads in relevant part:

> At no time before trial * * * did Allied [insurer] inform SCSC [insured] that the pollution exclusion barred either SCSC's indemnity request or its defense request. Allied specifically told SCSC * * * that Allied was investigating the claim. SCSC asked Allied on several occasions to state a coverage position, but at no time did Allied comply. Once SCSC came forward with facts showing arguable coverage * * *, Allied had to either defend SCSC * * * or further investigate SCSC's claim. * * * If Allied had investigated SCSC's defense request and had concluded that the pollution exclusion barred coverage, it was Allied's responsibility to communicate this conclusion to SCSC so that SCSC could have the opportunity to provide Allied with further information. In this case, Allied failed either to inform SCSC of its belief that the pollution exclusion applied or to provide a coverage position. Under these circumstances, Allied cannot now rely on its prior silence to defeat its duty to defend.

*Id.* at 316 n. 3 (citation omitted).

*SCSC* is distinguishable in that Allied did not merely fail to respond: it exchanged letters and information with SCSC and "led SCSC to believe that Allied was actively investigating the claim. In fact, this was not the case." *SCSC Corp. v. Allied Mut. Ins. Co.*, 515 N.W.2d 588, 602 (Minn.App.1994), *aff'd in part, reversed in part on other grounds and remanded, SCSC Corp. v. Allied Mut. Ins.*, 536 N.W.2d 305 (Minn.1995). Atlantic, in contrast, did not misrepresent its position to Redeemer; it simply did not respond to Redeemer's notice of claim.

We are not persuaded that the footnote in *SCSC* provides an adequate basis for holding that Atlantic waived its right to invoke its policy exclusions, particularly since such a holding would contradict the older, established principle that "[e]stoppel may not be used to create coverage where none is provided for in the contract." *Malakowsky v. Johannsen*, 374 N.W.2d 816, 819 (Minn.App. 1985).

In *Malakowsky* the insurer timely refused coverage in a letter citing three exclusions; the insurer's attorney later advised the insured's attorney of a fourth exclusion, which concededly barred coverage. *Id.* at 817. When in a subsequent garnishment action the insurer moved for summary judgment based on the fourth exclusion, the claimant argued that the insurer was estopped from raising this exclusion because it had not done so in its initial response. In affirming summary judgment for the insurer, the Minnesota Supreme Court stated:

> [I]t would be wholly improper to impose coverage liability upon an insurer for a risk not specifically undertaken and for which no consideration has been paid.

*Id.* at 819 (quoting *Shannon v. Great American Ins. Co.*, 276 N.W.2d 77, 78 (Minn.1979)). In *Shannon*, the insureds also urged estoppel, alleging that the insurer's agent had made an oral representation to settle their claim for almost $3,000 over the policy limits. The court upheld the insurer's position, observing that "[t]he doctrine of estoppel may not be used to enlarge the coverage of an insurance policy." *Id.* at 78.[6]

Atlantic's failure to respond timely to the notice of claim did not operate to enlarge Redeemer's coverage by estopping Atlantic from invoking the policy exclusions to which Redeemer had agreed.

## 2. Do the exclusions in Atlantic's PPL policies apply to Redeemer?

█ Atlantic's pastoral professional liability form reads:

> We will pay damages the insured becomes legally obligated to pay resulting from any "claim" made against the insured because of any negligent act, error or omission of the insured arising out of the performance of professional services for others in the insured's capacity as a pastoral counselor.

---

**6.** The *SCSC* footnote precluding Allied from invoking the pollution exclusion did not enlarge SCSC's coverage: *SCSC* states earlier that "[c]learly, the jury's finding that the damage arose from a sudden and accidental event established that SCSC met its burden to show the applicability of the exception to the pollution exclusion." *SCSC*, 536 N.W.2d at 314.

\* \* \* \*

This insurance does not apply to:

A.   Any dishonest, fraudulent, criminal or malicious act or omission of any insured;

\* \* \* \*

H.   Licentious, immoral or sexual behavior intended to lead to or culminating in any sexual act.

The district court held that the exclusions did not apply to Redeemer, because Redeemer was neither accused nor guilty of criminal acts or licentious behavior; Redeemer was accused of negligence in its supervision of Magnuson. We agree with the district court.

Case law is instructive in reaching the conclusion that Redeemer is not excluded from coverage even though Magnuson is.[7] In *Republic Vanguard Ins. Co. v. Buehl*, 295 Minn. 327, 204 N.W.2d 426 (1973), the plaintiff claimed that the insureds were negligent in failing to exercise reasonable control of their son when they purchased and allowed him to ride the motorcycle that injured the plaintiff. 295 Minn. at 329, 204 N.W.2d at 428. The insurer declined to defend because of an exclusion stating that the policy did not apply "to the ownership, maintenance, operation, use, loading or unloading of \* \* \* automobiles [defined elsewhere as land motor vehicles] \* \* \*." 295 Minn. at 329, 204 N.W.2d at 427 n. 1. The supreme court refused to invoke the exclusions to deny coverage and reasoned that the action was based not on the ownership or use of the motorcycle, but rather on the insureds' negligence in creating an unreasonable risk of harm by placing the motorcycle in the hands of their son. 295 Minn. at 332, 204 N.W.2d at 429. Redeemer's alleged negligence in supervising Magnuson is analogous to the negligence of

the insureds in *Buehl*. The action against Redeemer was not based on criminal or licentious acts of Redeemer, just as the action against the *Buehl* insureds was not based on the ownership or use of a motorcycle.

In arguing that the exclusions do apply to Redeemer, appellant cites *Faber v. Roelofs*, 311 Minn. 428, 435, 250 N.W.2d 817, 821–22 (Minn.1977) (holding that coverage of a negligence claim brought against a school district on behalf of a student injured by a bus was precluded by an exclusion for "bodily injuries arising out of the use" of a bus). *Faber*, however, distinguishes *Buehl*:

> [In *Buehl*, the] claim was held to be within the policy coverage, as it alleged common-law negligence in parental supervision, not negligence in the use of an automobile. In the case at bar, however, the exclusion does not apply merely to the *use* of an automobile, but to bodily injuries *arising out of* the use of an automobile and is thus distinguishable.

*Id.* (emphasis added). The critical distinction between *Buehl* and *Faber*, it seems, lies in the broader sweep of an exclusion containing the words "arising out of."[8] The relevant exclusions in Atlantic's policy, unlike those in *Faber*, but like those in *Buehl*, do not contain "arising out of" language: they apply to certain activities, i.e., criminal acts and licentious behavior.

The distinction between exclusions that contain the words "arising out of" and those that do not may be a fine one, but it is appropriate and sound. Insurers are free to draft lawful exclusions as they see fit. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Love*, 459 N.W.2d 698, 702 (Minn.1990) (holding

---

**7.**   It is undisputed that the exclusions preclude coverage of Magnuson. *See National Union Fire Ins. Co. v. Gates*, 530 N.W.2d 223, 227 (Minn. App.1995), *review denied* (Minn. June 23, 1995) (holding that because "[a]ll of the policies contain exclusions for malicious acts and sexual molestation" there was no coverage for a foster parent's acts of physical and sexual abuse); *Houg v. State Farm Fire & Cas. Co.*, 481 N.W.2d 393, 396 (Minn.App.1992) (applying an exclusion for "liability resulting from any actual or alleged conduct of a sexual nature" to hold that an insurer had no duty to defend a pastor against claims for sexual abuse), *review denied* (Minn. May 15, 1992). Atlantic's reliance on *Gates* and

*Houg* is misplaced: in both cases, the exclusions were held to apply to the actual perpetrator of the excluded acts. No party to this action challenges the application of the exclusions to Magnuson.

**8.**   *See also Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 734 (Minn.1997) (distinguishing a case where exclusions of coverage for property damage "arising out of" an owned premises were held applicable and holding that an exclusion of "damage *to* or destruction *of* property owned by the insured" did not apply).

that a professional liability insurer was obligated to defend its insured, a psychotherapist, against claims that he had mishandled the transference phenomenon. "If the underwriter does not want to provide coverage for this particular peril, it would seem it might exclude any claim for damages based on professional services in the treatment of transference which results in a sexual relationship between the insured and the patient."). Atlantic could have drafted its exclusions to cover injury or liability arising out of criminal acts or licentious behavior, but it did not do so.[9]

Atlantic could also have drafted other exclusions that would have applied to Redeemer. Again, case law is instructive. In *Allstate Ins. Co. v. Steele*, 74 F.3d 878, 881 (8th Cir.1996), the court (applying Minnesota law) upheld a joint obligations exclusion that precluded coverage for the insureds' alleged negligent supervision of their son and noted that although the Minnesota Supreme Court has not yet addressed a joint obligations exclusion, "most courts that have interpreted it have found that an insured's intentional acts bar claims against other insureds for negligent supervision." *Id.* Atlantic could have included such a provision.[10] Atlantic could have excluded coverage for every insured if any insured was guilty of a criminal act or licentious behavior. It excluded coverage, however, only for the criminal acts of any insured and licentious behavior intended to lead to or culminating in any sexual act.

Our holding that Atlantic's exclusion does not apply to Redeemer is consistent with *Buehl* and underscores a recognition that

narrowly drafted exclusions apply only to what they specifically exclude. Atlantic's policies did not exclude coverage for Redeemer's alleged negligence.

### 3. Did the 1989 claims preclude PPL coverage for the 1991 claims?

█ Atlantic argues that even if the exclusions in its PPL policies are inapplicable, there was no coverage for the 1991 claims because the 1991 PPL policy provided coverage for claims made only if the insured "had no knowledge of or could not have reasonably foreseen any circumstances which might result in a 'claim' or suit * * *." Atlantic argues that the claims brought in 1989 gave Redeemer knowledge of circumstances that might result in suits in 1991. We conclude that Atlantic's argument on this issue is without merit.

Redeemer purchased its 1991 policy in December 1990. No claims had been filed for 15 months, and none of the 1991 claimants had indicated any intent to file a claim. While Redeemer was aware of Magnuson's abuse and that the abuse had led to lawsuits, it had no knowledge that any 1991 claimant proposed to sue Redeemer for having negligently hired or supervised Magnuson.

To support its argument that Redeemer had knowledge of the 1991 claims, Atlantic relies exclusively on *Truck Ins. Exch. v. Ashland Oil, Inc.*, 951 F.2d 787 (7th Cir.1992) (holding that an insured's knowledge of his own fraud, on which litigation was pending, precluded coverage because the insured knew of circumstances likely to lead to a

**9.** Atlantic did include the "arising out of" language in some of its exclusions, although not in the criminal and licentious act exclusions. *See, e.g.,* exclusion (b): "Bodily injury * * * arising out of the ownership, maintenance, operation, use, loading or unloading of (1) Any automobile owned or operated by or rented or loaned to the Named Insured;" exclusion (d): "Liability arising out of one or more of the following offenses;" exclusion (e): "acts or omissions arising out of any trade, business, employment or profession other than that of a pastoral counselor."

**10.** We note that in the context of fire insurance, *Reitzner v. State Farm Fire & Cas. Co., Inc.*, 510 N.W.2d 20, 24 (Minn.App.1993), upheld an ex-

clusion for losses caused by "you [the named insured] * * * or any person insured under this policy[,]" holding that "the terms of the policy plainly exclude coverage for all insureds if any one of the insureds intentionally causes the loss." More recently, *Watson v. United Services Automobile Ass'n*, 566 N.W.2d 683, 691 (Minn.1997), held that while an exclusion for loss caused by the act of "an insured" was unambiguous and excluded coverage for innocent co-insured spouses, a policy containing such a clause was not viable under Minnesota law because it conflicted with "the legislature's use of 'the insured' in the Minnesota standard fire insurance policy [that] evinces a general intent to compensate an innocent co-insured spouse despite the intentional acts of the other insured spouse."

claim and had failed to disclose that information to the insurer).[11] This case, however, is readily distinguishable. Redeemer did not fail to disclose anything when it renewed its policy.[12] Because we hold that Atlantic had a duty to indemnify Redeemer, we need not address Atlantic's argument that it had no duty to defend. There is a duty to defend an insured on a claim when any part of the claim is arguably within the scope of the policy's coverage. *Jostens, Inc. v. Mission Ins. Co.*, 387 N.W.2d 161, 165 (Minn.1986).[13]

### 4. Do the PPL policies have priority over the CGL policies?

Having established that Atlantic had a duty to indemnify under its PPL policies, we turn to the priority among the various policies. Atlantic argues that the "other insurance" clauses in the various policies resolve the priority issue.

Some of the SPI, CMI, and LBI policies included "other insurance" clauses. Atlantic's PPL policies in effect from 1988–1990 did not contain "other insurance" clauses, but its PPL policies in effect from 1990–1993 provided that:

This Pastoral Professional Liability Insurance is excess over and above any other valid and collectible insurance (including any deductible portion) or agreement of indemnity, available to the insured.

Atlantic argues that each insurer should contribute an equal share to indemnify against the 1989 claims, but that for the 1991 claims,

Atlantic is not liable until the other insurers' policies are exhausted. Atlantic's argument is unpersuasive.

Particularly where there are overlapping or conflicting "other insurance" clauses, case law deprecates the blanket enforcement of any one clause.

In Minnesota, this court does not simply look at the type of "other insurance" clauses involved. In *Integrity Mutual Insurance v. State Automobile & Casualty Underwriters Ins. Co.*, 307 Minn. 173, 175, 239 N.W.2d 445, 446 (1976), this court explained that the better approach was to "allocate respective policy coverages in light of the total policy insuring intent, as determined by the primary risks upon which each policy's premiums were based and as determined by the primary function of each policy."

*Interstate Fire & Cas. Co. v. Auto–Owners Ins. Co.*, 433 N.W.2d 82, 85 (Minn.1988). *Interstate* involved one student injured by another. There was an "excess" clause in one of the school's policies, and the insurer sought reimbursement from the homeowners' policy of the parents of the student who caused the injury.

The court held that despite the "excess" clause, the school's policy had priority over the student's parents' homeowners' policy.

[The school's insurer] was not * * * relying on each student having a family homeowners policy when it calculated its risk in

---

**11.** There appears to be no Minnesota case law directly on point.

**12.** Cases from other jurisdictions indicate that "knowledge of circumstances that might result in a claim" has been held to mean more than speculation. *See, e.g., International Surplus Lines Ins. Co. v. Wyoming Coal Refining Sys. Inc.*, 52 F.3d 901 (10th Cir.1995) (explicit threat of litigation from a claimant will void coverage); *Hoyt v. St. Paul Fire & Marine Ins. Co.*, 607 F.2d 864 (9th Cir.1979) (inquiry by attorney not sufficient to void coverage); *American Continental Ins. Co. v. Marion Mem'l Hosp.*, 773 F.Supp. 1148 (S.D.Ill.1991) (neither knowledge of complicating circumstances surrounding a birth nor social service agencies' requests for medical records voided coverage); *International Ins. Co. v. Peabody Int'l Corp.*, 747 F.Supp. 477 (N.D.Ill. 1990) (insured should have reasonably foreseen claim or suit only after receiving documents

from claimant relating to legal obligations resulting from insured's failures); *Fremont Indem. Co. v. Lawton–Byrne–Bruner Ins.*, 701 S.W.2d 737 (Mo.Ct.App.1985) (insured's reasonable belief that it has resolved the matter potentially leading to litigation precludes constructive knowledge or circumstances that might lead to a claim); *Home Ins. Co. v. A.J. Warehouse, Inc.*, 210 So.2d 544 (La.Ct.App.1968), *reh'g denied*, (La. Oct. 3, 1968) (knowledge that floor installed by insured contributed to subsequent rack collapse was not opinion as to negligence and did not void coverage).

**13.** Although providing a defense, Atlantic could have reserved its right to contest coverage. *Economy Fire & Cas. Co. v. Iverson*, 445 N.W.2d 824, 826 (Minn.1989), *overruled on other grounds by American Standard Ins. Co. v. Le*, 551 N.W.2d 923, 927 (Minn.1996).

insuring the school district. * * * This injury caused by a student supervisor during a physical education class is precisely the type of risk [the school's insurer] intended to cover in providing catastrophic insurance to the school district. To hold that [the homeowners' insurer] is the primary insurer for this accident would be to ignore the intent of the respective policies.

*Id.* at 86. *See also Garrick v. Northland Ins. Co.*, 469 N.W.2d 709, 712 (Minn.1991) (citing *Interstate* and holding that two policies containing excess clauses took priority over a policy with no other insurance clause because that policy had as its primary function insuring passenger cars, not the truck involved in the accident, which was insured by the other policies).

■ Minnesota law indicates that priority among policies is determined not by the presence or absence of "other insurance" clauses, but by an analysis of the function and intent of the policies.[14] It remains for us to perform this analysis. Minnesota has used two tests for this purpose: the "total policy insuring intent" test, *Garrick*, 469 N.W.2d at 712, and the "closest to the risk" test, *Interstate*, 433 N.W.2d at 85.

■ The total policy insuring intent test was applied by the federal district court to establish the priority between a professional liability (PL) policy and a CGL policy. *Bettenburg v. Employers Liab. Assurance Corp. Ltd.*, 350 F.Supp. 873, 876 (D.Minn.1972), first noted that

[t]he more recent Minnesota decisions, however, seem to indicate that rather than simply making an attempt to resolve the conflicts in the language of the "other insurance" clauses of the various policies, the Minnesota Courts will attempt to ascertain "the total policy insuring intent" of the respective policies, and allocate the liabilities accordingly.

In *Bettenburg*, architects having a CGL policy with one insurer and a PL policy with another were sued for the collapse of a building.

[I]t seems clear to this Court that the [professional liability insurer] was the primary insurer of the risk involved in this action. The [professional liability] policy * * * was designed specifically to meet the type of liability to which the plaintiff architects were exposed as a result of the collapse of the building, whereas the policy issued by [the CGL insurer] appears to afford coverage as a mere incident of its object, which was to provide general, comprehensive liability coverage * * *.

*Id.* at 877. The CGL and PPL policies here have a relationship strikingly similar to those in *Bettenburg*. The PPL policies were designed to meet the type of liability to which Redeemer was exposed as a result of Magnuson's activities, while the CGL policies covered that liability only incidentally.

Total policy insuring intent is "determined by the primary policy risks and the primary function of each policy." *Garrick*, 469 N.W.2d at 712. Atlantic's PPL policies provided coverage specifically for claims made against Redeemer arising out of its pastor's performance of his professional duties, including counseling. The claims were the result of Magnuson's performance of his professional pastoral duties; the PPL policies intended to insure against such claims. The CGL policies, in contrast, provided only general coverage for occurrences of many types taking place during their policy periods. Analysis of the total policy insuring intent test leads us to the conclusion that the PPL policies had priority.

■ We obtain the same result with the closest to the risk test. This analysis asks three questions, two of which are almost identical with the total policy insuring intent test.

(1) Which policy specifically described the accident-causing instrumentality?

(2) Which premium is reflective of the greater contemplated exposure?

(3) Does one policy contemplate the risk and use of the accident-causing instrumentality with greater specificity than the oth-

---

**14.** This law is longstanding. *See, e.g., Bettenburg v. Employers Liability Assurance Corp.*, 350

F.Supp. 873, 876 (D.Minn.1972).

er policy—that is, is the coverage of the risk primary in one policy and incidental to the other?

*Interstate,* 433 N.W.2d at 86 (quoting *Auto Owners Ins. Co. v. Northstar Mut. Ins. Co.,* 281 N.W.2d 700, 704 (Minn.1979)). The second question is not answerable here because the premiums were set over a 30–year period, and there is no way of knowing which part of Redeemer's premiums applied to which type of policy. However, the answer to the first and third questions is clearly the PPL policies: they specifically described the accident-causing instrumentality, i.e., the performance of professional pastoral duties, and their coverage of the risk was primary, while the CGL policies said nothing specific about liability for pastoral acts and covered it only incidentally. Like the total policy insuring intent analysis, the closest to the risk analysis at least substantially supports the conclusion that the PPL policies have priority.

We therefore conclude that notwithstanding the "excess" clauses in the 1990–1993 PPL policies, the PPL policies take priority over the CGL policies with respect to the claims made here.

**5. Does Atlantic's first umbrella policy provide coverage?**

■ Atlantic's first umbrella policy did not include language restricting coverage to occurrences "during the policy period." The district court therefore held that under this policy, Atlantic was liable to defend and indemnify Redeemer for its "ultimate net loss" in excess of other insurance for the period covered by the policy.

Atlantic relies on *Jenoff, Inc. v. New Hampshire Ins. Co.,* 558 N.W.2d 260 (Minn. 1997), to argue that it has no obligation to provide coverage because no damages occurred during the policy period.[15] This reliance is misplaced; *Jenoff* is distinguishable. The policy at issue in *Jenoff* did include language stating that coverage applied only to occurrences happening during the policy period. The supreme court found there was no coverage for damage occurring outside

the policy period resulting from the insured's alleged negligence during the policy period.

[W]e conclude that Minnesota follows the general rule that an "occurrence" within the meaning of an occurrence policy is not the time when the wrongful act was committed but the time when the complaining party was actually injured, and the policy here clearly states that it applies only to occurrences taking place during the policy period * * *.

*Id.* at 261. Atlantic's policy did not state that it applied only to occurrences taking place during the policy period. Therefore, the fact that no injury occurred during that period is irrelevant.

The district court properly held Atlantic liable to defend and indemnify Redeemer for its "ultimate net loss" in excess of other insurance for the period covered by the policy.

**6. Did Atlantic have a duty to indemnify under its CGL policies?**

■ Redeemer, SPI, and CMI challenge the district court's determination that Atlantic had no duty to indemnify under its CGL policies because the "occurrences" and "bodily injury" for which the policies provided coverage took place prior to the policy periods. We agree with the district court's determination on this issue.

An occurrence is "the time when the complaining party was actually injured." *Id.* See also *Singsaas v. Diederich,* 307 Minn. 153, 238 N.W.2d 878 (1976) (holding that occurrence covered is triggered when the injury occurs during the policy period, regardless of when the accident occurred, and denying coverage for injuries that occurred after the policy had expired).

In holding that Atlantic had no duty to indemnify under its CGL policies, the district court specifically rejected the view that claimants' discovery of their injuries during the policy period was itself an occurrence. This rejection accords with *Blackowiak v. Kemp,* 546 N.W.2d 1, 3 (Minn.1996), holding that as a matter of law one is injured if one is sexually abused and that it is knowledge of

**15.** *Jenoff* was released after the district court filed its decision.

the abuse, not knowledge that the abuse caused an injury, that triggers an action for sexual abuse. Atlantic insured against abuse that caused injury during the policy periods. There was no abuse and no injury caused during Atlantic's policy periods. Claimants' subsequent knowledge that the abuse caused their injuries cannot be equated with an actual injury for the purpose of bringing their claims within a policy period any more than it can be done for the purpose of bringing the claim within a statute of limitations.

### 7. The loan receipt agreements.

■ SPI and CMI contributed to Redeemer's defense; funds for this purpose were transferred pursuant to their loan receipt agreements with Redeemer.

> Loan receipt agreements have long been recognized in this state and they are a useful device in disposing of insurance disputes.

*Jostens, Inc. v. Mission Ins. Co.*, 387 N.W.2d 161, 164 (Minn.1986). Pursuant to the loan agreements, the district court held that Atlantic was obligated to contribute 25% of the past costs of Redeemer's defense to SPI and CMI.

Atlantic argues that the district court erred, citing *Nordby v. Atlantic Mut. Ins. Co.*, 329 N.W.2d 820, 824 (Minn.1983) ("[a]n insurer has no right of action against another insurer to recover the cost of defending the insured, since there is no contractual obligation between insurers."). However, unlike *Jostens*, *Nordby* did not involve a loan receipt agreement. In *Jostens*, one insurer had paid the insured's defense costs "on a loan basis, *i.e.*, with the understanding that the money would be repaid to the extent recovery might be made from [another insurer] * * *." *Id.* at 164. The insured thus remained the real party in interest, entitled

to bring an action against the other insurer. *Id.*

> *Jostens* distinguishes *Nordby:*
>
> *Nordby* * * * is not in point. There * * * we held that [the insured] was not the real party in interest in a subsequent suit to recover the insurer's defense costs from another insurer that had denied coverage.

*Jostens*, 387 N.W.2d at 164. The loan receipt agreements in place here served to maintain Redeemer as a real party in interest in an action brought against Atlantic for the costs of defense. Atlantic's reliance on *Nordby* is misplaced. SPI and CMI are entitled to have Atlantic pay 25% of the costs of Redeemer's defense.[16]

### 8. Attorney fees.

■ When an action leads to a determination that an insurer breached its duty to defend, the insured may recover from the insurer the legal fees incurred in bringing that action. *Garrick,* 469 N.W.2d at 713. Our determination that Atlantic breached its duty to defend imposes on Atlantic the obligation to pay Redeemer's attorney fees.

■ Atlantic contests the amount of the attorney fees awarded by the district court. "On review, this court will not reverse a trial court's award or denial of attorney fees absent an abuse of discretion." *Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661 (Minn.1987). Atlantic argues that the district court abused its discretion in awarding Redeemer 100% of its claimed attorney fees because Atlantic should not be liable for fees incurred in dealing with the other insurers. We find no abuse of discretion in the district court's determination and note its observation that:

> It comes with poor grace for Atlantic to fly-speck the expenses incurred by Redeemer after it has sat on the sidelines all these years and refused to participate in Redeemer's defense of the underlying ac-

---

**16.** LBI initially contributed but then withdrew from Redeemer's defense. The district court determined that LBI is obligated to pay 25% of the costs incurred after its withdrawal. Because LBI did not have a loan receipt agreement in place with Redeemer, the district court denied LBI the right to recover any of its defense costs from Atlantic, pursuant to *Nordby*. In light of

*Nordby* and its predecessor, *Iowa Nat'l Mut. Ins. v. Universal Underwriters Ins. Co.*, 276 Minn. 362, 150 N.W.2d 233 (1967), we affirm the district court's holding, even as we agree with its observation that precluding an insurer who defends from bringing an action against a non-defending insurer absent a loan agreement may reward insurers for refusing to defend.

tions. These expenses arise out of the fact that Redeemer was forced by Atlantic's conduct to commence this declaratory judgment action. None of these expenses would have been necessary if Atlantic had not refused to defend the lawsuits tendered to it. * * * As to Atlantic's attempt to split hairs between arguments necessary to address the interplay of coverage provided by the policies of both Atlantic and the intervenor-plaintiffs, the Court believes these issues are inextricably intertwined and were necessary to address in this action again only because of Atlantic's refusal to defend.

## DECISION

There was no error of law in determining that Atlantic's PPL policies obligated it to defend and indemnify Redeemer for the 1989 and the 1991 claims; that the PPL policies take priority over CGL policies; that Atlantic's first umbrella policy imposes a duty to defend and indemnify; that Atlantic's CGL policies impose a duty to defend, but not indemnify; and that the loan receipt agreements entitle SPI and CMI to recover part of the costs of Redeemer's defense from Atlantic; and there was no abuse of discretion in requiring Atlantic to pay all Redeemer's legal fees incurred in bringing an action to establish Atlantic's obligations. We affirm the district court on all issues.

Affirmed.