529 N.W.2d 421 (1995)
Delbert P. TSCHIMPERLE, Appellant,
v.
AETNA CASUALTY & SURETY COMPANY, Respondent.
No. C5-94-1753.
Court of Appeals of Minnesota.
March 28, 1995.
Review Denied May 31, 1995.
*422 Britton D. Weimer, Hagglund & Weimer, Minneapolis, for appellant Delbert P. Tschimperle.
John H. Hinderaker, James B. Sheehy, Faegre & Benson, P.L.L.P., Minneapolis, for respondent Aetna Cas. & Sur. Co.
Considered and decided by PARKER, P.J., NORTON and SCHUMACHER, JJ.

OPINION
SCHUMACHER, Judge.
Delbert P. Tschimperle appeals summary judgment, arguing the district court erred in concluding that respondent Aetna Casualty & Surety Company (Aetna) did not breach its duties to defend and indemnify Clayton Management Inc. (Clayton Management) under the comprehensive general liability policy's property and advertising liability provisions. We affirm.

*423 FACTS
Clayton Management is an investment company that manages tax shelter lease investments. Under the investment scheme at issue, Lease Resources Corporation (Lease Resources) sold farm equipment to investors through Clayton Management. At the time of the sale, Klockmann & Sons, Inc., a farm corporation, leased farm equipment. Lease Resources contemporaneously assigned the lease to the investors. The lessee's debt was guaranteed by Wendell Klockmann, the president of Klockmann & Sons, Inc. Clayton Management closed the transactions and managed the leases, which involved but was not limited to, collecting rent payments, maintaining insurance. The investors received tax credits for 10% of the purchase price of the farm machinery, a depreciation deduction, and periodic lease payments.
Independent State Bank of Minnesota (Independent State Bank) provides investment services to its member banks. Independent State Bank sent literature to its member banks, and Independent State Bank and Clayton Management conducted seminars about the investment. Vesta State Bank, Wendell State Bank, and Belview State Bank purchased two of the leases.
Tschimperle is a certified public accountant. He was interested in a tax shelter and heard about Clayton Management's opportunities from someone at his office. He went to Clayton Management and spoke with its president, John Henrikson. Henrikson told Tschimperle that Klockmann was a good risk, that Independent State Bank had already worked out two other leases, and that the equipment would be used primarily in North Dakota. Tschimperle decided to purchase Lease 268, a Holland combine, for $149,750. The lease and supporting documentation provided that the equipment was new, located in North Dakota, and worth $149,750. Klockman defaulted on the lease. Tschimperle discovered that the equipment was used, located in California, and worth only $59,000. Tschimperle auctioned off the equipment and received $16,476 gross.
Clayton Management, as agent for Tschimperle and the other banks, sued Klockmann. The parties settled for a nominal amount. Tschimperle then sued Clayton Management, Independent State Bank, and Lease Resources for negligence, misrepresentation, rescission, conversion, and breach of contract, warranty, and fiduciary duty. Tschimperle alleged that Clayton Management and Lease Resources commingled his money with the money received from another lease and that this money was unlawfully converted. Independent State Bank was dismissed from the lawsuit because there was no joint venture between Independent State Bank and Clayton Management. Tschimperle v. Independent State Bank, No. CX-92-30, 1992 WL 138621 (Minn.App. June 17, 1992).
Clayton Management was a named insured under a comprehensive general liability (CGL) policy issued by Aetna. Clayton Management tendered defense of the lawsuit, but Aetna refused the tender. Tschimperle then notified Aetna that it was entering into Miller-Shugart negotiations with Clayton Management. Aetna chose not to participate. Tschimperle and Clayton Management entered into a Miller-Shugart agreement and Clayton Management assigned to Tschimperle its rights against Aetna. In April 1993, Tschimperle brought this garnishment action against Aetna. Both parties moved for summary judgment. The court ruled in favor of Aetna, concluding there was no "occurrence" and no "advertising activities" within the meaning of the policy and thus no coverage.

ISSUES
1. Are negligent misrepresentations and failure to timely repossess "occurrences" within the meaning of the CGL policy?
2. Are loss of investment and consequential damages flowing from the loss of use of property covered under a CGL policy?
3. Does in-person sales talk constitute "advertising?"
4. Is there coverage under an advertising liability provision where the insured has advertised its product to others but these advertising activities were unrelated to the investor's injuries?

*424 ANALYSIS
On appeal from summary judgment, this court decides whether the district court correctly applied the law and whether there are any genuine issues of material fact. State by Cooper v. French, 460 N.W.2d 2, 4 (Minn.1990). Interpretation of an insurance policy is a question of law, which this court reviews de novo. Garrick v. Northland Ins. Co., 469 N.W.2d 709, 711 (Minn.1991).
Tschimperle argues that Aetna breached its duties to defend and indemnify. The duty to defend is broader than the duty to indemnify and thus we will focus on it. Economy Fire & Casualty Co. v. Iverson, 445 N.W.2d 824, 826 (Minn.1989). If any claim is arguably within the scope of coverage of the insurance policy, the insurer must defend. Jostens, Inc. v. Mission Ins. Co., 387 N.W.2d 161, 165 (Minn.1986). The duty to defend is contractual in nature and is generally determined by comparing the allegations in the complaint with the language of the insurance policy. Prahm v. Rupp Const. Co., 277 N.W.2d 389, 390 (Minn.1979). The complaint is not controlling, however, where extrinsic facts establish the existence or nonexistence of the duty to defend. Johnson v. AID Ins. Co., 287 N.W.2d 663, 665 (Minn. 1980); see also Garvis v. Employers Mut. Casualty Co., 497 N.W.2d 254, 258 (Minn. 1993).
1. First, Tschimperle argues that the district court erred in determining that there was no coverage under the property liability clause. The clause provides:
The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * property damage to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental to the business of the named insured.
Occurrence is defined as "an accident * * * which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Property damage is defined, in part, as "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence." Tschimperle contends that there was an accident, citing to (1) Clayton Management's misrepresentation of the location of the equipment and (2) Clayton Management's failure to repossess the equipment in a timely manner. These accidents caused property damage, Tschimperle argues, because he lost the use of the combine and there were consequential damages caused by the delay. We disagree.
An accident is an unexpected or unforeseen happening. Sage Co. v. Insurance Co. of N. Am., 480 N.W.2d 695, 698 (Minn.App.1992). A claim for negligent misrepresentation requires that a pecuniary loss be caused by justifiable reliance on a statement. Florenzano v. Olson, 387 N.W.2d 168, 174 n. 3 (Minn.1986). Negligent misrepresentations cannot be "accidents" because the insured intends to induce reliance on the statement. First Wyo. Bank, N.A., Jackson Hole v. Continental Ins. Co., 860 P.2d 1094, 1100 (Wyo.1993) (citing Dykstra v. Foremost Ins. Co., 17 Cal.Rptr.2d 543, 545 (1993)); cf. McCollum v. Insurance Co. of N. Am., 132 Ariz. 129, 644 P.2d 283, 285 (App.1982) (negligent misrepresentations did not constitute occurrence where nothing happened to property itself); Terra Int'l, Inc. v. Commonwealth Lloyd's Ins. Co., 829 S.W.2d 270, 273 (Tex.Ct.App.1992) (negligent misrepresentations that resulted in loss of investment in real estate not property damage). The facts of this case support Aetna's position that there was no accident.
Tschimperle alleges that Clayton Management commingled funds. Clayton Management knew that Klockmann made late payments in October, November and December and yet still told Tschimperle that Independent State Bank checked out Klockmann in December.
Finally, Clayton Management knew when Klockmann was in default because it collected the rents. Under these facts, we conclude that any failure to timely repossess was not an unexpected, unforeseen, or unintended event.
*425 2. Even if these events could somehow constitute an accident, the general rule is that loss of investment does not constitute damage to tangible property. Travelers Indemnity Co. v. State, 140 Ariz. 194, 680 P.2d 1255, 1257 (App.1984); see also McCollum, 644 P.2d at 286 (loss of future profits not covered by CGL policy); Hommel v. George, 802 P.2d 1156, 1158 (Colo.Ct.App. 1990) (pure economic losses are intangible), cert. denied, (Colo. Dec. 17, 1990); Hartford Accident & Indemnity Co. v. Case Found. Co., 10 Ill.App.3d 115, 294 N.E.2d 7, 13 (1973) (investments, anticipated profits, and business ventures are intangibles); L. Ray Packing Co. v. Commercial Union Ins. Co., 469 A.2d 832, 835 (Me.1983) (mere economic damage is not loss of use of tangible property). In addition, while some courts have found coverage for consequential damages when there is physical injury to the property itself, we will not extend the concept to claims for "loss of use" of property. See Aetna Casualty & Surety Co. v. General Time Corp., 704 F.2d 80, 83 (2d Cir.1983) (no recovery for intangible losses unless physical damage to others' property); Travelers, 680 P.2d at 1257 (coverage for consequential damages where physical injury to tangible property); Hartford, 294 N.E.2d at 14 (may have coverage if plaintiff alleged actual damage to property itself which produced claimed damages).
We conclude the district court correctly determined that there was no duty to defend or indemnify under the property liability clause.
3. Next, Tschimperle argues that there is coverage under the policy's advertising offense provision. The policy provides:
The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * advertising offense sustained by any person or organization and arising out of the conduct of the named insured's business.
* * * * * *
"Advertising offense" means injury occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, * * * [or] unfair competition * * *.
Advertising activities is not defined under the policy; therefore, it must be given its plain, ordinary meaning. St. Paul Fire & Marine Ins. Co. v. National Computer Sys. Inc., 490 N.W.2d 626, 631 (Minn.App.1992), pet. for rev. denied (Minn. Nov. 17, 1992). Advertise means "[t]o make public announcement of" or "[t]o call the attention of the public to a product." American Heritage Dictionary 26 (3d ed. 1992). Black's Law Dictionary defines the term more broadly as:
Any oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business.
Black's Law Dictionary 54 (6th ed. 1990); see John Deere Ins. Co. v. Shamrock Indus., Inc., 696 F.Supp. 434, 439-40 (D.Minn.1988) (applying Black's Law Dictionary's definition of advertisement to conclude that sending three letters to one customer constitutes advertising), aff'd, 929 F.2d 413 (8th Cir.1991). "Solicit" means "[t]o appeal for something." Black's Law Dictionary at 1372.
Here, Tschimperle learned of the combine investment from someone in his office. He then went to Clayton Management and spoke to Henrickson about the tax shelter. Tschimperle did not learn of the investment because Clayton Management "call[ed] the attention of the public to a product" or because Clayton Management made statements soliciting his business. We therefore conclude that such in-person sales talk is not "advertising activity" for purposes of a CGL advertising offense policy. See Monumental Life Ins. Co. v. United States Fidelity & Guaranty Co., 94 Md.App. 505, 617 A.2d 1163, 1174 (Md.Ct.Spec.App.1993) ("advertising" is not susceptible to more than one meaning; "advertising" in advertising liability provision means "widespread distribution or announcements to the public"), cert. denied, 330 Md. 319, 624 A.2d 491 (Md.1993); cf. Fox Chemical Co. v. Great Am. Ins. Co., 264 N.W.2d 385, 386 (Minn.1978) (interpreting "advertising" in policy exclusion to mean widespread distribution); Playboy Enters., Inc. v. St. Paul Fire & Marine Ins. Co., 769 F.2d 425, 429 (7th Cir.1985) (interpreting "advertising" in policy exclusion to require *426 widespread distribution of promotional material to public at large).
4. Next, Tschimperle argues that Clayton Management engaged in advertising activities with the other banks and that this activity harmed him because he was induced into purchasing the tax shelter when he heard that the other banks purchased the same investment and because the bank's leases made Klockmann less solvent and thus Klockmann had to default on Tschimperle's lease.
We agree that Clayton Management engaged in advertising activities with the other banks in that Clayton Management and Independent State Bank gave seminars marketing the tax shelter and thereby called the attention of the investment to the public and solicited buyers. The next question is did Tschimperle's alleged injuries occur "in the course of the named insured's advertising activities" and did "such injury arise out of libel, slander, * * * unfair competition." We conclude that Tschimperle's injuries are too far removed from the advertising activities to the banks to afford coverage under this provision.
It is unclear whether the banks would have purchased the investment if Clayton Management had not conducted the seminars. Thus, Tschimperle may have been induced into purchasing the lease regardless of Clayton Management's advertising activities. But more importantly, the advertising activity in no way relates to Tschimperle's injuries themselves. Tschimperle relies on John Deere, 696 F.Supp. at 440, for the proposition that only a "but for," not a proximate cause, standard is required between the advertising activity and the sustained injury.
In John Deere, an employee of Shamrock Industries, Inc. (Shamrock) formed a new business. Id. at 435. The new business advertised to a third party, Cardinal Packaging, Inc. (Cardinal) who was one of Shamrock's competitors. Id. at 436. The advertisements to Cardinal set the factual basis for Shamrock's trade secret claim. Id. at 440. Here, the advertising activities to the banks are unrelated to Tschimperle's claims. Tschimperle's injuries giving rise to his claims for negligence, fraud, rescission, conversion, breach of contract, warranty, fiduciary duty and unfair competition would exist regardless of Clayton Management's advertising activities with the banks. We conclude there is no proximate cause or "but for" cause between Clayton Management's advertising activities and Tschimperle's injuries. There is no coverage under the policy's advertising liability provision.

DECISION
The district court correctly determined that there was no coverage under the property liability provision because there was no occurrence and no damage to tangible property. There was no coverage under the advertising liability provision because there were no advertising activities directed at Tschimperle and because the advertising activities directed at the banks were unrelated to Tschimperle's injuries.
Affirmed.