**The HOME INSURANCE COMPANY, et al., Appellants,**

v.

**NATIONAL UNION FIRE INSURANCE OF PITTSBURGH, PENNSYLVANIA, Respondent,**

**Travelers Insurance Company, Respondent.**

**No. C1–01–1429.**

Court of Appeals of Minnesota.

April 2, 2002.

---

See also 990 F.Supp. 720, aff'd, 131 F.3d 143.

James T. Martin, Gislason, Martin Varpness, P.A., Edina, MN, for appellants.

Robert E. Kuderer, Mark R. Azman, Johnson Condon, P.A., Minneapolis, MN, for respondent National Union Fire Insurance.

Thomas J. Shroyer, Mathew M. Meyer, Moss Barnett, Minneapolis, MN; and Thomas Holden, Morison Knox Holden Melendez Prough LLP, Walnut Creek, CA, for respondent Travelers Insurance.

Considered and decided by SCHUMACHER, Presiding Judge, HANSON, Judge, and PORITSKY, Judge.*

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

ROBERT H. SCHUMACHER, Judge.

Appellant insurance company initiated this action against respondent insurance companies, seeking reimbursement for defense costs incurred in defending a lawsuit involving their common insureds. Appellant-intervenor insureds joined the lawsuit thereafter, by way of a complaint in intervention. The district court granted respondent insurance companies' motions for summary judgment, ruling that neither respondent had an obligation under their respective insurance policies to provide a defense, and, accordingly, appellant insurance company was not entitled to reimbursement for defense costs. We affirm in part, reverse in part, and remand.

## FACTS

### 1. The Parties to this Appeal

Appellant is The Home Insurance Company (Home). Appellant-intervenors, collectively referred to as the Cargill Group, include: (1) Cargill, Inc., a Delaware corporation with its principal place of business in Minnetonka, Minnesota; (2) Waycrosse, Inc., a Minnesota corporation until June 1991 (Waycrosse, MN), at which time a new entity was formed, with the same name, but incorporated in Delaware (Waycrosse, DE)[1] with the Minnesota entity merging into Cargill (both Waycrosse, MN and Waycrosse, DE operated out of Cargill's offices in Minnesota with the same employees and conducting the same business operations); (3) Willknight, Inc., a holding company and wholly-owned subsidiary of Cargill, and operator of various Cargill subsidiaries including intervenor, Silent Knight; and (4) Silent Knight, a division of Waycrosse, MN until it was merged into Cargill, at which time Silent Knight became an operating division of Willknight.[2] Respondents are National Union Fire Insurance of Pittsburgh, Pennsylvania (National Union) and Travelers Insurance Company (Travelers).

Home, National Union, and Travelers had insurance contracts with one or more of the Cargill Group at various times. Home insured, under general liability policies, Silent Knight and Willknight from at least 1989 until 1994, and Waycrosse, MN from at least 1989 until June 1991, when it ceased to exist. National Union insured the Cargill Group under general liability umbrella policies beginning June 1, 1989 through 1994, and also provided primary liability insurance to Cargill, Inc.[3] Travelers insured Waycrosse, DE, from June 25, 1991 until at least 1995 under general liability policies.

### 2. The Complaint in the Underlying Action

In May 1993, Life Point Systems, Inc. and others initiated a lawsuit in United States District Court in California (Life Point action). The complaint contained numerous allegations against numerous defendants concerning conduct over a period of several years starting with 1988 and continuing through the date of filing, May 1993. Life Point alleged that it had developed a spread spectrum, radio frequency

---

1. For purposes of differentiation and clarity, the two "Waycrosse, Inc." entities have been given the "MN" and "DE" qualifiers in this opinion. In actuality, the two entities had, at all times, the same name: "Waycrosse, Inc." Waycrosse, DE came into existence on June 13, 1991, and Waycrosse, MN was merged into Cargill, Inc. on June 25, 1991.

2. Subsequently, Silent Knight was apparently sold first to Honeywell and then to Pittway. The sales do not affect this appeal.

3. The policies identified as insureds Cargill, Inc., Waycrosse, Inc., and subsidiaries of which Cargill, Inc. owned at least 50%.

device (the Device) for use in security systems. The complaint alleged that Life Point owned "proprietary rights" to the Device. The Device carried three patents. At times, the complaint referred to various Cargill entities separately and at other times referred to them collectively as "the Cargill Group" (the Complaint Cargill Group).[4] Waycrosse was included in the Complaint Cargill Group.

The complaint alleged that in 1988, Life Point began negotiating with Cargill and its subsidiaries to allow Cargill to start marketing the Device by way of a licensing agreement between the Complaint Cargill Group and Life Point. The negotiations continued into 1989, and after executing a confidentiality agreement, the Complaint Cargill Group received various documents and information regarding the Device. In September 1990, however, the negotiations ended without an agreement.

The complaint further alleged that the Complaint Cargill Group thereafter engaged in improper conduct, including patent infringement and tortious interference, by way of publication of materials, unfair and false advertising, disclosing and marketing Life Point's confidential, proprietary, and trade secret information. The complaint contained 12 separate counts, four of which made allegations against "the Defendants," one of which specifically named a number of defendants, including Waycrosse, and seven of which made allegations against the Complaint Cargill Group. All 12 counts included an allegation that the conduct complained of was ongoing and would continue unless enjoined by the court.

The Life Point complaint prayed for compensatory damages in excess of $200 million for the misconduct, as well as for breach of contract, misappropriation and conversion, unfair competition, and civil conspiracy. The complaint demanded treble damages, as well as exemplary damages of $260 million. Notably, the complaint also asked for a variety of equitable relief, including an injunction

> perpetually restraining the Defendants * * * from *further infringement* of the aforesaid patents, from further use or disclosure of any trade secrets or other confidential information * * * [of] the Plaintiffs, *or any further acts* of unfair and false advertising, breach of contract, * * * unfair competition, civil fraud, * * * or civil conspiracy against any Plaintiff.

(Emphasis added.) The complaint requested that Waycrosse "be ordered specifically to perform and abide by their confidentiality agreements."

The complaint referenced activities that occurred in December 1990, including Waycrosse's purchase of stock in Voyager, and each of the Cargill entities joining with Voyager and others to announce "a joint venture to develop [the Device] via a partnership between Cargill, Waycrosse, Silent Knight and Voyager, headed by [other individuals also named as defendants]." The complaint alleged the joint venture "was in the form of Voyager Security Systems Partnership." The complaint gave the partnership the identifier "VSS." Notably, the complaint included VSS in its designation of the Complaint Cargill Group, as well as Waycrosse, Cargill, and others as individual entities.

The complaint also alleged a variety of improper conduct occurring throughout 1991, 1992, and continuing thereafter.

---

**4.** The Complaint Cargill Group included each of the entities identified as the Cargill Group in this opinion plus a few additional entities.

Life Point alleged that the Complaint Cargill Group,

> in continuous fashion, * * * conspiring together and acting in concert, published materials, solicited business, and marketed and used Life Point's confidential, proprietary and trade secret information * * * pertaining to the Device * * *.

The complaint then listed several "specific examples of [these] published materials," including six that were created after June of 1991. Additionally, the complaint alleged that the Complaint Cargill Group improperly demonstrated and displayed a wireless, spread spectrum security device at trade shows starting in August of 1991 and continuing through 1992.

The Life Point complaint attempts to identify and sort through the various entities, many of which were related to one another or others in a way not made clear until several years later. The complaint's caption, in relevant part, listed the defendants as follows:

CARGILL, INC., a Delaware corporation

SERVE: THE CORPORATION TRUST COMPANY
1209 Orange Street
(County of Newcastle)
Wilmington, Delaware 19801

and

WAYCROSSE INC., now merged into
CARGILL, INC., a Delaware corporation

SERVE: THE CORPORATION TRUST COMPANY
1209 Orange Street
(County of Newcastle)
Wilmington, Delaware 19801

and

SILENT KNIGHT SECURITY SYSTEMS, INC.,
a/k/a WAYCROSSE, INC., a Delaware
corporation a/k/a division of
WAYCROSSE, INC., now merged into
CARGILL, INC., a Delaware corporation

SERVE: THE CORPORATION TRUST COMPANY
1209 Orange Street
(County of Newcastle)
Wilmington, Delaware 19801

The complaint identified the parties with the following information:

8. Defendant Waycrosse, a/k/a Silent Knight, *was a Delaware corporation,* and is now merged into Cargill. Waycrosse has regularly conducted *and continues to conduct* business in California, *both before and after* the merger * * *.

9. Defendant Silent Knight, a/k/a Waycrosse, and a/k/a a division of Waycrosse, has regularly conducted *and continues to conduct* business in California, *both before and after Waycrosse's merger* into Cargill * * *.

(Emphasis added.) The undisputed facts are that Waycrosse, Inc. originally was a Minnesota corporation, and that entity was merged into Cargill in June of 1991. At that same time a new entity evolved, with the same name, as a Delaware corporation.

### 3. Home's Duty to Defend

Waycrosse and Silent Knight sent copies of the complaint to Home in June of 1993. On November 15, 1993, Home sent a response letter to Kimberly Haigh, Risk Manager for Waycrosse. The response stated that Home would advance defense costs on behalf of Silent Knight and Waycrosse, while specifically reserving Home's rights to: (1) assert any and all defenses to coverage, (2) withdraw from the defense, (3) seek reimbursement of defense fees and costs, (4) allocate defense costs between covered and non-covered claims and/or defendants, and (5) seek a declaratory judgment that neither defense nor indemnity is owed.

Home subsequently brought a declaratory judgment action, filing suit in federal court in California for a determination that no coverage was even arguably owed for the Life Point action, and thus Home did not have a duty to provide a defense. That lawsuit eventually was moved to federal court in Minnesota. During litigation, the Cargill Group, in an attempt to establish that Home owed coverage, argued that

Waycrosse, MN was a defendant in the Life Point action. The only issue before the federal court was whether or not Home owed a duty to defend by way of its insuring Waycrosse, MN. The federal court decided that at least some of the Life Point claims were arguably within the scope of coverage such that Home was required to provide a defense to the lawsuit. *Home Ins. Co. v. Waycrosse, Inc.*, 990 F.Supp. 720, 730–31 (D.Minn.1996), *aff'd*, 131 F.3d 143 (8th Cir.1997). Neither Travelers nor National Union was a party to the federal court litigation.

Significantly, the court found that the Life Point complaint included wholesale allegations against each of the Cargill Group entities, including Cargill, Waycrosse, and Silent Knight, as well as VSS, the alleged partnership or joint venture entity. *Id.* at 729. "[I]t is at least 'arguable' that the Complaint alleges the defendants engaged in conduct taken in their separate corporate capacities." *Id.* The federal court then concluded that the conduct alleged in the Life Point complaint arguably fell within the Home policies' definition of "advertising injury," and thus triggered the duty to defend. *Id.* at 730. The court specifically stated that it was making no determination regarding whether or not Home's policies actually provide coverage for any of the Life Point plaintiffs' claims or necessarily that Home must indemnify the defendants for any of these claims. *Id.* at 731.

**4. The Cargill Group's Communications with Travelers**

The Life Point complaint was served in May of 1993 on the various defendants' registered agents for service, most of which were located outside Minnesota. Soon thereafter, the complaint found its way to Cargill's offices, and to Waycrosse, Inc. (for our purposes, Waycrosse, DE).

Eventually, in February 1994, Dorothy Becker of Travelers confirmed receipt of the Life Point complaint in a letter to Kimberly Haigh, risk manager for Waycrosse, DE.

On July 18, 1994, Becker sent a letter to Haigh informing Waycrosse that Travelers would not be providing a defense or any coverage for the Life Point lawsuit. Becker began by citing policy language excluding coverage for conduct occurring in a partnership or joint venture that is not a named insured. The letter then cites the allegation in the complaint that a joint venture was formed involving Waycrosse in December of 1990. Becker asserted:

It appears clear that any alleged actions or offenses on the part of Waycrosse which may have taken place during our policy periods * * * would have arisen from their involvement in the joint venture.

As such, Travelers denied coverage under the joint venture exclusion. Becker's letter also stated:

This letter is not intended to be, nor is it to be construed as an exhaustive presentation of all the terms, conditions, limitations or exclusions of the insurance contract which might limit or preclude coverage for this matter. Further, the Travelers reserves its right to supplement this letter and does not waive any right to assert other defenses.

**5. The Cargill Group's Communications with National Union**

The Life Point complaint was sent to Cargill's insurance department. Thomas Peiffer was an attorney in the insurance department with the title of "Casualty Insurance Specialist." The majority of Peiffer's experience and day-to-day responsibilities were in the area of workers' compensation. Peiffer's supervisor, Brian Turnwall, directed Peiffer to report the

matter to National Union. On July 6, 1993, Peiffer sent a copy of the Life Point complaint to American Risk Management. Peiffer's cover letter and the complaint were then forwarded to National Union.

On August 25, 1993, Peiffer received a letter by facsimile transmission from Jonathan Sher, an attorney for National Union. Sher asked Peiffer to contact him as soon as possible. The next day Sher faxed a second letter stating:

> It was a pleasure speaking with you today. * * *
>
> You advised that *the tender of defense* and indemnity to National [Union] is on behalf of Cargill, Waycrosse * * *. In terms of our analysis and evaluation, we shall conduct ourselves accordingly.

(Emphasis added.) Eventually, Sher sent a third letter to Peiffer, on December 9, 1993. This letter again confirmed Peiffer's "tendering this matter to [National Union] * * * on behalf of Cargill, Waycrosse, and Silent Knight only." The letter asserted, in a footnote, that Cargill had not maintained the underlying insurance required by National Union's policies. Sher stated:

> We would appreciate your confirming or disaffirming this understanding. If there is underlying insurance, please advise us regarding the identity of the insurer and forward a copy of the policy.

The letter then went on to set forth Sher's analysis of the claims in the Life Point complaint and Sher's opinion that coverage was not generally owed.

A careful reading of Sher's correspondence reveals several items of importance. In two instances, Sher states that "there *does not appear* to be coverage for this count" (emphasis added), as opposed to other instances where Sher asserts, "there is no coverage." Also, at another point Sher states:

The complaint alleges a number of communications that are alleged to be false and misleading. *To the extent these communications were made prior to June 1, 1990 no coverage would arise* for damages caused by such communications.

(Emphasis added.) Sher also stated that the injunctive relief prayed for in the Life Point complaint does not involve money damages, and therefore there would be no coverage for any injunctive relief awarded. Sher also stated that the defense costs endorsement depended upon the insured's having underlying insurance in place. As such, "[w]e are uncertain whether this provision applies in view of our uncertainty concerning the existence of underlying insurance."

In short, Sher's letter denied coverage for many claims, implied a denial of coverage for others, and never conceded coverage for any. Sher concluded by reserving National Union's "right to pursue a declaratory relief action in order to obtain a judicial determination of its coverage obligations, if any, under the policy." Sher also reiterated his request for information regarding any underlying coverage.

In response to Sher's inquiry regarding the underlying coverage, Peiffer sent a letter on February 9, 1994:

> This letter is in response to yours dated November 9, 1993.
>
> This will confirm that there is underlying coverage for the [Life Point suit]. Attached you will find a copy of the policy provided by [Home].
>
> We acknowledge receipt of your letter in which you reserve your rights concerning coverage issues discussed in the letter. We hereby reserve any and all rights we may have to obtain coverage for this loss under the stated excess policy.

Despite having received this information regarding the underlying coverage, Sher never provided an additional position statement regarding defense costs, a duty to defend, or coverage. Instead, Sher informed Peiffer that National Union was closing its file.

### 6. National Union Policies' Requirements "in the Event of an Occurrence"

National Union insured Cargill, Waycrosse, Silent Knight and Willknight under three excess, or "umbrella" policies: 1) BE 194–49–36, in effect June 1, 1989 through June 1, 1990; 2) BE 205–78–43, in effect June 1, 1990 through June 1, 1992; and 3) BE 308–65–20, in effect June 1, 1992 through June 1, 1993. Each of these policies required only that with the happening of a possible "occurrence" involving alleged injuries or damages, which in the event the "insured should be held liable [would be] likely to involve this policy, immediate notice shall be sent to [National Union]." The policy in effect from June 1, 1992 through June 1, 1993, carried several "Endorsements," among them # 11, amending this provision to read:

> Notice of Occurrence will be given to the Insurance Company as soon as practicable after the employees or officers of the Insurance Department of the named insured in Minnesota become aware of the Occurrence.

National Union also insured Cargill and Waycrosse under a primary policy in effect from June 1, 1991 to June 1, 1992. This policy's provision regarding the insured's obligations in the event of an occurrence required that the insured (1) provide notice of the claim or lawsuit, (2) forward legal papers received or prepared in connection with the suit, and (3) cooperate with the investigation and defense of the claim or suit.

### 7. Home's Attempts to Obtain Reimbursement for Defense Costs

Cargill retained attorneys to defend the various Cargill entities in the Life Point action. David Biek, Cargill's general counsel, had responsibility for overseeing and managing the Life Point action on behalf of Cargill, Waycrosse, and Silent Knight. According to Biek, the same firm was retained to defend each of these entities under a joint defense arrangement. For bookkeeping purposes, Cargill's subsidiary, Willknight (also a defendant in the Life Point action), paid the outside firm's bills and carried the expense on its accounting statements. Nonetheless, Cargill and Waycrosse received the benefit of the joint defense.

The joint defense was successful, eventually resulting in a dismissal of the claims against the Cargill entities in the Life Point action. The defense costs totaled approximately $3 million.

Following the federal court's ruling that Home owed a duty to defend, Home and Cargill negotiated at length regarding Home's paying Cargill's defense costs incurred to date and ongoing. Eventually, Home agreed to "advance" $500,000 toward the defense costs until the issue was decided. Still later, Home and Cargill came to an arrangement whereby Home "advanced" additional defense costs pursuant to a loan receipt agreement that reserved Home's right to seek reimbursement from National Union and Travelers. The loan receipt agreement was ultimately executed on May 18, 2000.[5]

---

**5.** The record indicates that the Cargill Group may have significant unreimbursed defense costs, as well as incurring loss of the time value of the money it advanced to defend the Life Point action, and loss of opportunity costs as it relates to the cash advanced.

Robert Lumpkins, chief financial officer for Cargill, signed the loan receipt agreement at the explicit direction of Biek. Lumpkins signed for each Cargill-related entity, including Waycrosse. Steven Hornig, Waycrosse's general counsel, did not sign the loan receipt agreement, nor did he directly authorize Lumpkins to sign on Waycrosse's behalf. According to Biek, however, Hornig had told Biek that Biek had

> authority to allow [Home] to institute this action in intervention on behalf of Waycrosse, Cargill, Silent Knight and Willknight in order to recover the costs incurred in defending the *Life Point* action. I understood this authority to have included the execution of the Loan Receipt Agreement on behalf of Waycrosse.

Additionally, Hornig never testified that he had withheld any such authority or that he or anyone else at Waycrosse had ever eschewed the loan receipt agreement on behalf of Waycrosse, DE.

Home initiated an action against National Union and Travelers to recover the defense costs or a pro rata portion thereof. Home alleged that Travelers incorrectly denied Waycrosse's request for a defense under the joint enterprise exclusion. Home also alleged that National Union improperly refused to provide a defense to Waycrosse. After executing the loan receipt agreement, the Cargill Group joined in Home's complaint. The complaint in intervention alleged that the Cargill Group had provided timely notice of the Life Point lawsuit to both National Union and Travelers and that each had denied coverage in writing for the Life Point lawsuit. The complaint in intervention alleged that the denials were improper, and that as a result,

> one or more of the plaintiffs/intervenors [Home and the Cargill Group] have sustained damages in an amount in excess of $2,450,000 [the amount referenced in the loan receipt agreement] together with interest thereon. In addition, additional damages in the form of attorneys' fees and costs will be incurred by or on behalf of plaintiffs/intervenors in bringing the present action to enforce their respective rights under the policies referenced above in an amount in excess of $50,000.

National Union and Travelers brought summary judgment motions. The district court first addressed their arguments that Home lacked standing to seek reimbursement. The district court concluded that the loan receipt agreement allowed Home to bring the lawsuit. The district court considered Travelers' newly-asserted defense to coverage, to-wit, the argument that the "Waycrosse, Inc." that Travelers insured (Waycrosse, DE) was not implicated in the Life Point action. The district court then determined that no material fact issue existed as to whether or not Waycrosse, DE was involved in the Life Point action, and Travelers was entitled to judgment as a matter of law.

The district court then addressed the issue as to whether or not National Union owed reimbursement to Home under three separate provisions in the National Union policies. The court concluded that the Cargill Group had not experienced an ultimate "net loss" as defined in the policy. Because Home was responsible for all of the defense costs, and the policy excluded costs covered by other insurance, the Cargill Group had not suffered a loss under the policy terms, and no duty to defend arose under Insuring Agreement I.

The district court also concluded that the Cargill Group had failed to trigger a duty to defend on the part of National Union. The district court, after deciding that the term "tender of defense" has not

as yet been explicitly defined in Minnesota law, noted a split in the non-controlling authorities. The district court then concluded that an insured must make a "specific request for a defense" to an excess insurer when "the primary insurer is obligated to defend the suit." The court also concluded that "[n]o reasonable person could conclude from these facts that the Cargill defendants specifically requested a defense from National Union." Accordingly, the district court concluded that National Union had no liability under Insuring Agreement II either.

The district court then addressed a "Defense Costs Endorsement" that called for National Union to indemnify "the particular underlying insurer(s) on a per occurrence basis for all costs of defending the insured in excess of $750,000." This endorsement carried with it a notice provision, requiring the insured to notify National Union and obtain its written consent before incurring additional defense costs in excess of $750,000. Notice was not given until defense costs approximated $2 million, and only then by Home, not by the Cargill Group. The district court rejected Home's argument that National Union could not rely on the notice provision under the rule that an insurer who has first breached the insurance contract cannot attempt to bind the insured to subsequent obligations under that insurance policy and concluded that National Union's reservation of rights did not constitute a breach of contract.

As a result of these determinations, the district court granted National Union and Travelers' motions for summary judgment, dismissing Home and the Cargill Group's complaint with prejudice. This appeal followed.

## ISSUES

1. Does Home have standing to seek reimbursement from National Union and Travelers for the defense costs incurred in the Life Point action?

2. Did the Cargill Group trigger National Union's duty to defend?

3. Does National Union owe reimbursement for defense costs incurred under "Insuring Agreement I?"

4. Does National Union owe reimbursement for defense costs incurred under the "Defense Costs Endorsement?"

5. Does Travelers owe reimbursement for defense costs incurred?

## ANALYSIS

### Standard of Review

■ Upon review of a grant of summary judgment, the appellate courts must determine whether the trial court erred in deciding that there are no issues of material fact, and whether the trial court correctly applied the law. *Wallin v. Letourneau,* 534 N.W.2d 712, 715 (Minn.1995). The evidence must be viewed in the light most favorable to the party against whom summary judgment was granted. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). The interpretation of an insurance policy is a question of law which the court reviews de novo. *Iowa Kemper Ins. Co. v. Stone,* 269 N.W.2d 885, 886–87 (Minn.1978).

■ When construing insurance contracts, the duty to defend is broader than the duty to indemnify. *St. Paul Fire & Marine Ins. Co. v. Briggs,* 464 N.W.2d 535, 539 (Minn.App.1990), *review denied* (Minn. Mar. 15, 1991). The duty to defend "an insured on a claim arises when any part of the claims is arguably within the scope of the policy's coverage." *Jostens, Inc. v. Mission Ins. Co.,* 387 N.W.2d 161, 165–66 (Minn.1986) (citation omitted). If an insurer claims no duty to defend, the insurer bears the "burden of showing that all parts

of the cause of action fall clearly outside the scope of coverage." *Id.* When determining whether an insurer had a duty to defend, the court must consider the duty as of the time of the tender of defense. *Id.* at 166. The court looks to the allegations in the complaint at issue, as compared with the policy language involved, to determine whether the duty to defend exists. *Tschimperle v. Aetna Cas. & Sur. Co.*, 529 N.W.2d 421, 424 (Minn.App.1995) *review denied* (Minn. May 31, 1995). Extrinsic evidence can be considered if consisting of actual facts that clearly resolve the duty to defend issue. *Id.*

### 1. Home's Standing to Pursue Reimbursement

█ The district court determined that Home had standing to pursue reimbursement from National Union and Travelers for defense costs incurred in defending the Life Point action pursuant to the Loan Receipt Agreement. The district court noted that the general rule in Minnesota had been that an insurer cannot pursue reimbursement from another insurer for defense costs incurred. *Nordby v. Atl. Mut. Ins. Co.*, 329 N.W.2d 820, 824 (Minn. 1983); *Iowa Nat. Mut. Ins. Co. v. Universal Underwriters Ins. Co.*, 276 Minn. 362, 368–69, 150 N.W.2d 233, 237 (1967). The trial court went on to note, however, the well-established exception to this general rule when a Loan Receipt Agreement is in place. *Jostens,* 387 N.W.2d at 164–65; *Redeemer Covenant Church of Brooklyn Park v. Church Mut. Ins. Co.*, 567 N.W.2d 71, 82 (Minn.App.1997), *review denied* (Minn. Oct. 2, 1997). The district court correctly ruled that the loan receipt agreement allows Home to pursue reimbursement from National Union and Travelers for the defense costs.

Travelers asserts, however, that the loan receipt agreement is immaterial as to Home's claims against it. Travelers argues that its insured, Waycrosse, DE, never bound itself to the loan receipt agreement and that this is established by Hornig's testimony. We disagree. The evidence indicates that Lumpkins had at least apparent authority to sign on behalf of Cargill, Silent Knight, *and Waycrosse,* by way of Biek's explicit instruction. Biek gave this instruction only after having received authorization from Hornig to allow Home's lawsuit to recover the costs incurred in defending the Life Point action.

### 2. Notification of the Life Point Action to National Union

After Cargill received the Life Point complaint, it was transmitted to its insurance department. Biek stated that he believed Cargill made a "collective tender" to National Union on behalf of "the Cargill Group." Biek believed the Insurance Department made this collective tender.

Peiffer was an attorney in Cargill's Insurance Department. Turnwall was Peiffer's supervisor. Turnwall told Peiffer to report the matter to National Union. Peiffer sent a copy of the complaint to National Union by way of Lawrence Walters at Global Claims Service Corporation. On receipt of the complaint, National Union retained attorney Sher to represent it. On August 26, 1993, Sher confirmed by letter to Peiffer that "the tender of defense and indemnity to National is on behalf of Cargill, Waycross[e] and Silent [K]night which you advised has merged into Cargill." Later, Sher wrote a lengthy letter analyzing National Union's potential coverage for the Life Point action. Included in this letter was a second confirmation of a "tender" to National Union.

National Union relies on certain parts of Peiffer's deposition testimony to argue that there was no tender. Peiffer testified that he did not know what the term of art,

"tender of defense," meant. We conclude that this testimony is not conclusive on the issue. Instead, we look to the facts and the parties' conduct to determine whether there was a tender. Minnesota law has not explicitly defined this term.

The district court described a split in the authorities having already faced the issue as to what constitutes the "tender of a defense." *See Towne Realty, Inc. v. Zurich Ins. Co.*, 201 Wis.2d 260, 548 N.W.2d 64, 66 (1996). The *Zurich* court described this split in the authorities as follows:

> Several courts have held that an insurer only needs to be put on notice for the duty to defend to be invoked. Other courts require the insurer [sic] to specifically request the insurance company to defend the suit. *See, e.g., Hartford Acc. & Indem. Co. v. Gulf Ins. Co.*, 776 F.2d 1380, 1383 (7th Cir.1985); *Casualty Indem. Exchange Ins. Co. v. Liberty Nat'l Fire Ins. Co.*, 902 F.Supp. 1235, 1239 (D.Mont.1995); *Litton Systems, Inc. v. Shaw's Sales & Serv., Ltd.*, 119 Ariz. 10, 579 P.2d 48, 52 (Ct.App.1978).

*Id.* at 66–67 (other citations omitted).

The district court decided that the insured must specifically request the insurance company to defend the lawsuit. We disagree.

In *Hartford Acc. & Indem.*, Gulf Insurance initially received notice of a lawsuit from another party to the lawsuit, not its insured. 776 F.2d at 1383. Ten months later, Hartford's attorney sent a request for Gulf to provide a defense. *Id.* The court specifically noted that no official of the insured ever asked Gulf to defend, the attorney was acting on his own initiative, and there was no "evidence or even an allegation that the attorney was carrying out the orders or wishes of the [insured]." *Id.* The critical factor was that there was nothing to show that *the insured* sought the insurer's assistance, not the semantics of the request itself.

Similarly, in *Cas. Indem. Exch. Ins. Co.*, the focus was not on the specific words used or not used when seeking the insurer's assistance but instead upon the timing of the notification to the insurance company itself. 902 F.Supp. at 1238–39. The circumstances of that case were unique. The insurers involved did not have overlapping or simultaneous coverage of the insured. *Id.* at 1236. Instead, the action began on the last day of one insurer's (Casualty) coverage of the insured and may have spilled over into the first day of the other insurer's (Liberty National) coverage. *Id.* The insured had procured each of these policies from the same insurance agent. *Id.* The agent had notice of the claim, which constitutes legal notice to each insurer. *Id.* The insured had not asked Liberty National for assistance with the lawsuit, until after Casualty had negotiated a settlement on the insured's behalf, but *Casualty's solvency came into doubt. Id.* at 1236–37. At that time, Liberty National itself was made aware of the lawsuit. *Id.* at 1237. The court noted that since the suit had already been settled at that point in time, this could not constitute a request for assistance in the form of a defense. *Id.* at 1239. The key language in this decision states that

> mere knowledge that an insured is sued does not constitute tender of a claim. What is required is knowledge that the suit is potentially within the policy's coverage coupled with knowledge that the insurer's assistance is desired.

*Id.* (quotation omitted). The court went on to conclude that under the unique circumstances involved, equity dictated that Casualty should not be allowed contribution from Liberty National. *Id.*

In *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 316 (Minn.1995), the supreme court stated:

> Generally, * * * the formal tender of a defense request is a condition precedent to the recovery of attorney fees that a party incurs defending claims that a third party is contractually obligated to pay.

(Citations omitted). The court did not specify what, precisely, constitutes a formal tender of a defense request. The cases cited in *SCSC Corp.*, however, indicate that the supreme court was contemplating something other than a specific request.

In *Hill v. Okay Constr. Co., Inc.* 312 Minn. 324, 346, 252 N.W.2d 107, 121 (1977), the supreme court stated that the purpose of the tender rule is to provide the party from whom indemnification is sought the opportunity to handle the defense. The *Hill* court cited *Sorenson v. Safety Flate, Inc.*, 306 Minn. 300, 235 N.W.2d 848 (1975). *Sorenson* provides additional clarity as to the supreme court's reasoning and intention regarding the tender rule. The *Sorenson* court quoted extensively from a federal court decision in which an "implied invitation" to defend was found sufficient; the federal court did not require a formal tender. *Id.* at 307, 308, 235 N.W.2d at 853. The *Sorenson* court determined:

> No such invitation can be implied in the present case where Standard Oil *insisted on* its own defense. Hennessy–Three Star was *never given an opportunity* to control the litigation * * *.

*Id.* at 308, 235 N.W.2d at 853 (emphasis added).

Moreover, the court's ruling in *SCSC Corp.* hinged upon the time the insurer was given notice and the opportunity to defend. The corporation first provided notice to the insurer with an October 6, 1989 letter requesting indemnification for all liabilities including "all sums associated with the investigation, defense and resolution of these claims." 536 N.W.2d at 317. The supreme court held that the insurer could not be responsible for fees incurred prior to this October 6, 1989 letter. *Id.* The focus was not on the specific words used in the notice letter, but instead on the timing of the letter. The insurer was responsible for the defense costs from the date of the letter forward. All of the Minnesota Supreme Court cases discussed above also involved a consideration as to the prejudice suffered by the third-party and the inequity of holding the third-party responsible for defense costs incurred prior to any opportunity for the third-party to accept the duty to defend. *See id.; Hill*, 312 Minn. at 346, 252 N.W.2d at 121; *Sorenson*, 306 Minn. at 308, 235 N.W.2d at 853.

■ Based upon our reading of *SCSC Corp.* and the cases cited therein, we believe the better rule of law is to hold that the insurer's duty to defend under an excess or "umbrella policy" is triggered when the insurer is placed on notice of the lawsuit and provided with the opportunity to defend.

■ The present case is a good illustration of why the "notice with implied invitation to defend" analysis is the preferable rule. Here, the Cargill Group complied with the policy requirements regarding a triggering of National Union's duty to defend, including those National Union imposed within the umbrella policies. Further, National Union treated the notice provided as a specific request for a defense. Sher himself confirmed the tender and proceeded with a detailed and involved analysis of the claims and potential coverage for each claim. National Union clearly understood the Cargill Group's notification as a request for a defense.

Although Sher's correspondence fell short of an unequivocal denial of any and all coverage, a reasonable reading of the letter, taken as a whole, was that National Union's position was that no coverage was owed. Sher systematically addressed each claim and stated either that coverage was not owed, it "did not appear" that coverage was owed, or that coverage was not owed for certain types of relief. Sher never conceded that any coverage was owed for any claim. Sher also reserved National Union's rights to seek a declaratory judgment action and to present any additional defenses to coverage. The only real possibility Sher left for coverage was under the defense costs endorsement, which National Union believed was not covered because of a lack of the required underlying insurance. Peiffer sent the additional information regarding underlying insurance coverage, not for purposes of negating National Union's potential duty to defend, but instead for purposes of implicating that duty and in response to Sher's request.

Nonetheless, National Union did not step forward and provide or participate in a defense. Nor did National Union bring a declaratory action to determine whether a duty to defend was owed, and National Union decided not to join in Home's declaratory judgment action regarding potential coverage for the Life Point lawsuit. Instead, National Union closed its file.

■ We agree with the Wisconsin Supreme Court's reasoning in *Towne Realty*. When determining whether or not a particular claim falls within the coverage afforded by a particular insurance policy, all ambiguities and doubts are resolved in favor of finding coverage. *Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 692 (Minn.1997). Significant to this rule of law is the recognition that insurers, vis-à-vis insureds, occupy a position of greater knowledge and understanding of insurance

coverages, interpretation of policy provisions, and the scope of an insurer's responsibilities and those of another insurer that may provide additional protection. *Towne Realty*, 548 N.W.2d at 67. The same reasoning should apply when determining whether and when the duty to defend is triggered. *Id.*

■ We believe the Wisconsin Supreme Court is correct, and we adopt this reasoning:

> [I]f it is unclear or ambiguous whether the insured wishes the insurer to defend the suit, it becomes the responsibility of the insurer to communicate with the insured before the insurer unilaterally foregoes the defense. This places the burden of ensuring clear communication between the insurer and the insured on the insurer, who is better positioned, in terms of expertise and resources, to manage such a task.

*Id.* (footnote omitted) (quotation omitted). If the insurer can demonstrate, by clear and convincing evidence, that the insured made an informed waiver of the potential contractual right to a defense, then no ambiguity would exist.

■ National Union and Travelers argue that because an umbrella insurer is involved, the legal definition of a "tender of a defense" should be different. We disagree. Many times the insured will not understand the precise nature of "excess" versus "primary" coverage. Rarely will the insured understand the precise limits of one coverage and the possible extensions afforded by another. Indeed, the present case provides a good example of how very unclear insurance policies, coverages, and competing coverage responsibilities can be. Moreover, no insurer had conceded coverage at the time National Union was provided with the opportunity to defend. As such, we believe National

Union and Travelers' position, which would place on the insured the burden of determining which insurer should provide which coverage, is neither practical nor realistic. Instead, the responsibility for determining the coverage owed must fall upon the insurer or insurers, as the case may be. The insured still has the obligation, of course, to cooperate in terms of providing information relevant to the coverage determination.

We see no justification for imposing, by way of judicial fiat, additional responsibilities on the insureds beyond those specifically enumerated in the insurance contracts. In the present case, the Cargill Group complied with the policies' requirements, including those set forth in the umbrella policies. The "notice as soon as practicable" and "duty to cooperate" responsibilities would seem the limits of the insurer-mandated obligations on the insured for triggering the duty to defend an arguably covered claim.

 Under "Insuring Agreement II," National Union was required to provide the insureds a defense for "occurrences covered under [National Union's] policy but not covered by any underlying policies." National Union was required to "defend any suit against the Insured alleging liability insured under the provisions of this policy * * * even if such suit is groundless." We believe that National Union's policy provided additional coverage to its insureds in the Life Point lawsuit, beyond that provided by Home's policy, in that National Union's policy included defamation, piracy, and unfair competition in the definition of "advertising injury," whereas Home's did not. These claims were included in the myriad of allegations in the Life Point complaint. We hold that some of the claims in the Life Point lawsuit were arguably covered under "Insuring Agreement II" as of the time National

Union's duty to defend was triggered. Accordingly, the responsibility was owed, and National Union breached its insurance contract by not providing a defense.

Significant to our decision is the federal court's recognition that it was not called upon to determine whether Home owed *indemnification* for the Life Point suit. *Home Ins. Co.*, 990 F.Supp. at 731. The federal court ruled only that Home had a duty to defend because at least *some* of the claims were *arguably* covered. *Id.* at 730–31. Accordingly, that decision does not mean necessarily that certain *other* claims might fall outside Home's coverage and within that of another insurer. *See Jostens*, 387 N.W.2d at 166 (both primary and excess insurer may have simultaneous duties to defend).

National Union's duty to defend was effectively triggered when National Union received copies of the Life Point complaint forwarded by Peiffer. We conclude that Peiffer's transmittal of the complaint was sufficient to notify National Union that the Cargill Group was requesting a defense. National Union's own conduct and unequivocal statements establish that it considered Cargill's conduct a tender of the defense, and indeed all requirements as set forth in National Union's policies had been met. The Cargill Group never explicitly waived the right to a defense from National Union nor prevented National Union from providing a defense. Moreover, to the extent any ambiguity existed as to whether or not the Cargill Group was seeking a defense from National Union, that ambiguity should be resolved in favor of the insured.

### 3. Duty to Defend under "Insuring Agreement I"

The district court ruled that National Union did not owe a duty under "Insuring

Agreement I." This provision in the policies provides:

> The Company [National Union] agrees:
>
> **COVERAGE.** To pay on behalf of the Insured that portion of the ultimate net loss excess of the retained limit as hereinafter defined, which the Insured shall become legally obligated to pay as damages for liability imposed upon the Insured by law * * * caused by an occurrence.

The policy defined "ultimate net loss" as follows:

> **ULTIMATE NET LOSS**—Except as provided in Insuring Agreement II, "Defense," the term "Ultimate Net Loss" shall mean the total sum which the Insured, or any company as its insurer, or both become obligated to pay by reason of personal injury, property damage, or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges * * * and for settlement, adjustment, investigation and defense of claims * * *.
>
> The Company shall not be liable for expenses as aforesaid when such are covered by underlying policies of insurance * * *.

The district court concluded that National Union did not owe coverage under this provision in the policy because the federal court had determined that Home had a responsibility to provide the insureds with a defense. Because the defense costs were thus covered by underlying policies of insurance, the insureds had not experienced any "net loss" as that term was defined in National Union's policies.

Home appears to concede this point, but argues that the district court's interpretation and application of this policy provision renders the purported coverage "illusory." Home argues that this renders the provision "ambiguous," and as such the language must be construed so as not to frustrate the insureds "reasonable expectations" regarding the coverage afforded by this provision. Home and the Cargill Group rely upon *Atwater Creamery Co. v. W. Nat'l Mut. Ins. Co.*, 366 N.W.2d 271 (Minn.1985), for this argument.

 We do not agree. Although the provision as applied in the case at bar did not afford any coverage for the defense costs the Cargill Group incurred, Home and the Cargill Group did not present evidence indicating the insureds, in fact, "reasonably expected" some alternative interpretation. *See id.* at 278–79 (facts and circumstances of case indicated that the insured "reasonably expected" coverage purchased would cover the loss as experienced). Neither have Home nor the Cargill Group sufficiently demonstrated that coverage would never be owed under any circumstances such that the provision is truly "illusory." Accordingly, the district court correctly determined that no coverage is owed under "Insuring Agreement I."

### 4. Reimbursement under the "Defense Costs" Endorsement

National Union's policies also contained Endorsement Number 4, providing:

> The company shall indemnify the particular underlying insurer(s) of the Insured on a per occurrence basis for all costs of defending the Insured in excess of $750,000.
>
> The Insured shall notify the company when it is reasonably apparent to the Insured that "defense costs" will reach $750,000 and shall obtain the written consent of the company before incurring additional fees, costs or expenses, such consent not to be unreasonably withheld.
>
> * * * *

With regard to any occurrence, failure of the Insured to obtain the written consent of the Company set forth above, shall render this endorsement without effect as to that occurrence.

For purposes of this endorsement, "defense costs" shall be defined as attorney's fees, charges, and law costs, * * * and for litigation, settlement adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder * * *.

Home and the Cargill Group argue that reimbursement is owed under this provision.

The district court determined that the insureds had not complied with the notice requirement set forth in this provision, and, as such, no reimbursement was owed as a matter of law. Home and the Cargill Group concede that the insureds did not comply with the notice requirement. They argue, however, that National Union cannot hold the insureds to this policy obligation because National Union breached the insurance contract prior to this requirement taking effect. The district court ruled that National Union's reservation of rights did not constitute a breach, and therefore the non-compliance excuse was not an available defense for Home and the Cargill Group.

■ We do not agree. Although the reservation of rights is not generally a breach in and of itself, National Union did not defend the insureds in the Life Point action under such reservation of rights. Because we have determined that National Union had a duty to defend, under "Insuring Agreement II," National Union breached the insurance contract prior to implication of the notice requirement. Accordingly, National Union cannot capitalize on the Cargill Group's subsequent failure to provide notice under this provision. *See MTS Co. v. Taiga Corp.*, 365 N.W.2d 321,

327 (Minn.App.1985) ("a party cannot raise to its advantage a breach of contract against another party when it has first breached the contract itself."), *review denied* (Minn. June 14, 1985). The Cargill Group's compliance was not mandated subsequent to National Union's breach.

National Union breached the insurance contract by not providing a defense under "Insuring Agreement II" as owed at the time the duty was triggered. National Union cannot now attempt to hold its insureds responsible for subsequent obligations under the contract National Union breached. Additionally, it is doubtful that National Union would have been able to withhold consent without violating the corresponding obligation not to do so "unreasonably." Moreover, it is far from clear that National Union would have been able to decrease the defense costs as incurred with any such notice. As such, we conclude that National Union has suffered no prejudice by not receiving notice prior to the defense costs reaching $750,000. In any event, National Union created this situation itself by not providing a defense as owed and by not seeking a court determination as to whether coverage was owed. National Union's prior breach excused the Cargill Group's failure to provide notice.

### 5. Travelers' Duty to Provide a Defense

Travelers initially denied Waycrosse a defense on the grounds that the allegations in the Life Point complaint involved conduct undertaken in the context of a joint enterprise. Following the federal court's determination that at least some of the allegations in the Life Point complaint implicated the defendants named therein in their individual capacities, Travelers adopted a new defense to coverage. Home and the Cargill Group argue that Travel-

ers has waived its right to assert this defense.

Although Travelers relied on the joint enterprise exclusion in Becker's correspondence denying coverage to Waycrosse, DE, Becker specifically stated that other defenses may apply and Travelers was reserving its right to assert any other possible defenses. Home and the Cargill Group argue, however, that although Travelers may have initially preserved its right to raise additional defenses (i.e., the "wrong Waycrosse" defense), Travelers eventually relinquished this right by continuing to assert only the joint enterprise defense.

 The district court considered the "wrong Waycrosse" defense and granted Travelers' motion for summary judgment on this basis. Generally, an estoppel or waiver theory should not be used to enlarge an insurance policy's coverage and impose liability for a risk not contemplated by the parties to the insurance contract and one for which no consideration was given. *Shannon v. Great Am. Ins. Co.*, 276 N.W.2d 77, 78 (Minn.1979); *Redeemer Covenant Church*, 567 N.W.2d at 76. Home and the Cargill Group assert that at some point, an insurer's "reservation of rights" to assert additional defenses must become ineffective, and cite to *SCSC Corp.*, 536 N.W.2d at 316 as support for this argument.

In *SCSC Corp.*, the supreme court held that, under the circumstances involved therein, the insurer should not be allowed to assert a particular defense to coverage after not having mentioned the defense earlier. *Id.* at n. 3. In *SCSC Corp.*, however, the insurer misled the insured, claiming to be conducting an investigation in order to decide whether coverage was owed. *Id.* The insurer was not actually investigating the claim, and did not provide the insured with its coverage position despite several requests from the insured.

*Id.* Only at trial did the insurer bring up the exclusion at issue, and the supreme court held that the insurer could not assert this previously unmentioned defense to coverage, having inexcusably placed the insured at such a disadvantage. *Id.*

 We find the instant case distinguishable from *SCSC Corp.* Here, Travelers asserted its coverage position, a denial, to Waycrosse soon after the tender of defense. Travelers also informed Waycrosse that other defenses might apply and Travelers was specifically reserving its right to assert these defenses. Travelers never lied nor misled Waycrosse. Although Travelers did not avail itself of a declaratory judgment action to determine the coverage issue, and Travelers did rely solely on the "joint enterprise" defense well into the coverage dispute, we are not convinced that its conduct rises to a level sufficient to create an exception to the general rule prohibiting enlarging coverage by way of estoppel. At some point, an insurer's improper conduct and an insured's reasonable reliance to its detriment on that conduct creates a situation whereby it becomes patently unfair to allow the insurer to assert a particular defense to coverage. The *SCSC Corp.* decision recognizes this. Although Travelers' conduct may have come close, we do not believe that it crossed the line here. Factored into our determination regarding this issue is the fact that the insured, Waycrosse, suffers no prejudice given our determination that Travelers' "wrong Waycrosse" defense is without merit and is rejected based upon a review of the Life Point complaint. Waycrosse was not damaged by not being able to respond to this defense with additional facts earlier in the proceedings because no such response was necessary. The complaint alone establishes Travelers' duty to defend. The dis-

trict court did not err in allowing Travelers to assert the new defense to coverage.

Travelers argued that the allegations in the Life Point complaint implicated only "Waycrosse, MN," and none of the claims even arguably implicated "Waycrosse, DE," Travelers' insured. The district court concurred, and ruled that Travelers was entitled to a dismissal as a matter of law. We disagree.

Under the appropriate standard, the allegations in the Life Point complaint must be construed in a light most favorable to the non-moving party, in this case Home and the Cargill Group. *See Jostens,* 387 N.W.2d at 165 (duty to defend arises when *any* part of a claim is *arguably* covered). Any ambiguity, likewise, must be resolved in favor of Home and the Cargill Group in favor of finding coverage. *Prahm v. Rupp Constr. Co.,* 277 N.W.2d 389, 390 (Minn. 1979).

 We hold that the Life Point complaint included allegations implicating Waycrosse, DE. The Life Point complaint must be reviewed, in its entirety, to determine if any of the allegations might arguably fall within the coverage under Travelers' policy, i.e., whether any of the claims arguably implicated Waycrosse, DE. Several of the allegations involve conduct that the defendants performed after June 1991, i.e., after Waycrosse, MN ceased to exist and Waycrosse, DE began. Whether or not these claims are dubious is not part of the analysis. *See Meadowbrook, Inc. v. Tower Ins. Co.,* 559 N.W.2d 411, 417 (Minn.1997) (duty to defend all claims *arguably* covered until *completely* extinguished). Additionally, these allegations were made against many of the defendants, including "the Cargill Group." The Life Point complaint clearly identified "the Cargill Group" as including "Waycrosse." As such, the Life Point complaint clearly included allegations against Travelers' insured.

Travelers argues, "only one Waycrosse was sued in the Life Point action." This argument does not find support in the complaint. The allegations against Waycrosse involving conduct that occurred both before and after Waycrosse, DE came into existence, and after Waycrosse, MN ceased to exist, belie this contention. Naming and serving Cargill, Inc. as a defendant effectively made Waycrosse, MN a party to the action. Suing "Waycrosse, Inc." in order to make claims solely against "Waycrosse, MN" would have been largely superfluous. The mere fact that "Waycrosse, Inc." is named and served supports the contention that "Waycrosse, DE" was sued in the Life Point action.

Travelers bases its argument, in large part, on the complaint's caption and the identification of the parties in the complaint. Neither of these references support Travelers' position. The caption of the complaint is ambiguous. The complaint's caption mentions "Waycrosse, Inc." at three different points. Following these references are appositives or modifiers that are either misplaced or unspecified.

For instance, the Life Point plaintiffs use the term "a Delaware corporation" ambiguously in the caption. It is impossible to tell whether the phrase is intended to modify the entity immediately preceding it, or if it is intended to relate back to the entity appearing before the appositive set off by commas. Moreover, under either theory, "Waycrosse, Inc." is described as "a Delaware corporation," given the different points in the caption mentioning Waycrosse, Inc. The Delaware Waycrosse is the entity Travelers insured.

When identifying the parties, the Life Point plaintiffs state, inconsistently, that Waycrosse "was a Delaware corporation,

and is now merged into Cargill." Actually, the Minnesota entity was merged into Cargill. Additionally, Waycrosse is mentioned in both Paragraphs 8 and 9, when identifying the parties, and plaintiffs allege that Waycrosse "has regularly conducted *and continues to conduct* business * * * both before *and after Waycrosse's merger into Cargill.*" (Emphasis added.) Finally, each count of the Life Point complaint alleges that the conduct complained of is continuing, and seeks injunctive relief to stop the conduct. These allegations implicate Waycrosse, individually, and as a specifically-identified member of "the Cargill Group," and could only be aimed at the Waycrosse existing as of the time the complaint was filed, i.e., Waycrosse, DE, Travelers' insured.

Travelers also cites several instances in which Cargill argued to the federal court, in response to Home's contentions, that "Waycrosse, MN" was sued in the Life Point action. This is not conclusive to the inquiry at hand. When determining whether an insurer improperly denied a tender of defense, the court must focus on the complaint and undisputed extrinsic facts in existence as of the time of the tender. *Jostens,* 387 N.W.2d at 166. None of the Cargill assertions Travelers cites existed as of the time of the tender. Furthermore, Cargill is entitled to make alternative arguments to the court in alternative proceedings. The record also reveals that Cargill, by way of Biek, also made subsequent assertions that the Life Point complaint does include allegations against Waycrosse, DE. Moreover, Cargill's assertions as to whether or not Waycrosse, DE was a defendant in the Life Point complaint do not establish these assertions as unassailable fact. This is not Cargill's determination to make. Instead, it is for the court to decide whether the allegations in the complaint, when con-

strued in a light most favorable to finding coverage, indicate a duty to defend.

The claims in the Life Point action included allegations implicating Travelers' insured. As such, Travelers owed a duty to defend.

## DECISION

The district court correctly ruled that Home had standing to seek reimbursement for defense costs advanced to the Cargill Group under the loan receipt agreement. The district court correctly ruled that National Union did not owe coverage to the Cargill Group under "Insuring Agreement I." Accordingly, the district court properly granted National Union's motion for summary judgment.

The district court erred, however, in determining that no coverage was arguably owed for the Life Point action under "Insuring Agreement II." National Union's duty to defend was triggered when it received notice and breached the insurance contract by not providing a defense. Additionally, once National Union breached the insurance contract, it could not hold its insured responsible for the notice provision under the "Defense Costs" endorsement.

The district court erred in ruling that Travelers' insured, Waycrosse, DE, was not included in the Life Point action. The Life Point complaint included allegations against Travelers' insured. As such, Travelers owed a duty to defend, as a matter of law. Accordingly, we remand to the district court for a determination of the appropriate allocation among the insurers of defense costs incurred by the Cargill Group in the Life Point action.

**Affirmed in part, reversed in part, and remanded.**